THEODORE C. TURPIN ET AL., APPELLEES, V. STANDARD RELIANCE INSURANCE COMPANY (MUTUAL), A CORPORATION, ET AL., APPELLANTS.

99 N. W. 2d 26

Filed November 6, 1959. No. 34634.

234

*Stubbs & Metz,* for appellants.

*Healey, Davies, Wilson & Barlow,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

The plaintiffs, Theodore C. Turpin and Union Insurance Company, a corporation, brought this action for a declaratory judgment in the district court for Dawes County against the Standard Reliance Insurance Company (Mutual), a corporation; Midwest Furniture Company, a corporation; James W. Blanford, individually,

and as assignee of Midwest Furniture Company, a corporation; Saint Paul-Mercury & Indemnity Company, a corporation; and Wilbur Ross Jones, Jr., defendants. The trial court ordered that the defendants James W. Blanford, the Midwest Furniture Company, and the Saint Paul-Mercury & Indemnity Company be dismissed from the action. The purpose of the action was to obtain a declaratory judgment determining and declaring that the coverage and terms of the contract issued by the Standard Reliance Insurance Company (Mutual) to Wilbur Ross Jones, Jr., extends to all claims against Theodore C. Turpin for injuries or damages which arose out of an accident while Theodore C. Turpin was driving a 1949 Buick automobile described in the insurance policy of the Standard Reliance Insurance Company (Mutual), a corporation. The trial court found generally for the plaintiffs and against the defendants. A declaratory judgment was rendered declaring that the insurance policy issued by the Standard Reliance Insurance Company (Mutual), a corporation, extended coverage to Theodore C. Turpin with respect to the accident in question. The defendants each filed a separate motion for new trial. These motions were overruled, and defendants perfected appeal to this court.

For convenience we will refer to Theodore C. Turpin as Turpin; to the Union Insurance Company, a corporation, as Union; to the Standard Reliance Insurance Company (Mutual), a corporation, as Standard; to Wilbur Ross Jones, Jr., as Jones; to the Midwest Furniture Company, a corporation, as Midwest Furniture; to General Motors Acceptance Corporation as G.M.A.C.; and to James W. Blanford, as Blanford.

We summarize the pleadings necessary to a determination of this appeal as follows.

The plaintiffs' petition alleged that Turpin was at all times mentioned therein a resident of Chadron, and Jones was also a resident of Chadron; that on January 20, 1954, there was in effect an insurance contract be-

tween Jones and Standard by the terms of which Standard insured Jones against any loss or damage arising from the operation of a 1949 Buick automobile owned by Jones and used by him; and that on January 20, 1954, there was in effect an insurance contract between Turpin and Union by the terms of which Union insured Turpin against any loss or damage arising from the operation of a 1938 Chevrolet sedan owned by Turpin.

It was further alleged that on January 20, 1954, at approximately 5:30 p.m., the 1949 Buick automobile owned by Jones and covered by Standard was involved in an accident on U. S. Highway No. 20 approximately 2 miles east of Chadron, with a 1952 Studebaker pickup truck owned by Midwest Furniture and driven by Blanford; that said 1949 Buick automobile was being operated by Turpin with the permission of Jones; that as a result of said accident, Midwest Furniture's 1952 Studebaker pickup truck was damaged and Blanford was injured; that timely notice of said accident and the damages and injuries sustained by Blanford was given to Standard, but Standard denied any and all liability to Turpin, denied any obligation to indemnify and protect Turpin in the premises, and refused to do so; that thereafter suit was commenced by Blanford individually and as assignee of Midwest Furniture in the district court for Dawes County, alleging that the negligence of Turpin was the proximate cause of the accident, and seeking to recover damages for injuries sustained by him and, as assignee of the Midwest Furniture, for damages to the 1952 Studebaker pickup truck, and also seeking to recover, as assignee of Midwest Furniture, the medical, hospital, and disability payments allegedly paid to him, or on his behalf, by Saint Paul-Mercury & Indemnity Company, the workmen's compensation insurance carrier of Midwest Furniture; and that timely notice of said suit was given Standard, but Standard denied any and all liability to Turpin, denied any obligation to indemnify and protect him from the claims for injuries and

damages thus sustained by virtue of the accident, and refused to defend such suit. Plaintiffs contended that Standard had an obligation to defend Turpin in the suit against him by Blanford individually and as assignee of Midwest Furniture; that said obligation arose from the contract of insurance issued by Standard to Jones; and that said obligation also included the payment of any judgment or judgments that might be rendered against Turpin as the result of the law suits growing out of said accident. The petition contained a prayer for a declaratory judgment determining that the coverage and terms of the insurance policy issued by Standard to Jones extended to all claims against Turpin which arose out of the accident while Turpin was driving the 1949 Buick automobile described in Standard's insurance policy.

The answer of Jones and Standard denied any liability under Standard's insurance policy issued to Jones by the terms of which Standard insured Jones against any loss or damage arising from the operation of a 1949 Buick automobile used by Jones or with his permission. The answer alleged that within 10 days prior to January 20, 1954, Jones sold and delivered to Turpin the 1949 Buick automobile; that on January 20, 1954, the Buick automobile was being operated by Turpin as the owner thereof, and not with the permission of Jones within the meaning of Standard's insurance policy and the Union's insurance policy; that on January 20, 1954, the 1949 Buick automobile was newly acquired by Turpin less than 30 days previously; and that on said date the 1938 Chevrolet automobile owned by Turpin was broken down and could not be operated or repaired. The prayer was that defendants might go hence without day and recover their costs expended in this action.

The plaintiffs' reply denied every allegation contained in defendants' answer not admitted in the petition, and renewed plaintiffs' prayer for a declaratory judgment.

The record discloses that Union issued a motor ve-

hicle liability policy insuring Turpin against any loss or damage arising out of the operation of a 1938 Chevrolet owned by Turpin. The term of this policy was from September 28, 1953, to September 28, 1954. On Christmas day 1953, while Turpin was driving his Chevrolet automobile, it became disabled and was sold for junk.

Standard issued a motor vehicle liability policy insuring Jones against loss or damage arising out of the operation of a 1949 Buick automobile owned by Jones. The term of this policy was from January 5, 1954, to July 5, 1954.

Jones purchased the 1949 Buick automobile in August 1953, from Prey Chevrolet Company of Chadron. The sale was financed by G.M.A.C., and insofar as this action is concerned its office was in Denver, Colorado, where the certificate of title issued to Jones for the 1949 Buick automobile was held. Jones was leaving for the Marine Corps in January 1954. He was trying to make a sale of his 1949 Buick automobile and obtain something for his equity in the automobile, but was unable to find a buyer on such terms. Turpin displayed some interest in buying the 1949 Buick, but he had no money to make a down payment on it. Jones told Turpin he was going into the Marine Corps and could not keep up the payments on his automobile but he hated to turn it back to the Prey Chevrolet Company; that his father did not especially want to take it over; and that he could not take it with him. The upshot of it was that Jones suggested that Turpin could use the Buick if Turpin could make the payments.

Turpin went to the Prey Chevrolet Company with Jones where they talked to a salesman. Jones wanted to know if it would be all right with the Prey Chevrolet Company if Turpin would make the payments, and Prey Chevrolet Company seemed willing to let him do so. A contract was drawn in writing by a salesman named Ken C. Graves at the Prey Chevrolet Company.

After a diligent search made by Graves and counsel for the parties, the original contract, or a copy of it, could not be found in the Prey Chevrolet Company office. Turpin testified that he did not remember signing any such contract, and that he would have remembered signing such a contract if he had done so. Graves testified that the written contract provided that Jones agreed to sell the 1949 Buick automobile to Turpin, and in consideration thereof Turpin agreed to make the payments on the automobile which Jones was obligated to pay G.M.A.C. Jones testified to the written contract, and that it was signed by both Jones and Turpin.

On January 17, 1954, some friends of Jones drove him to Scottsbluff in the 1949 Buick automobile. From Scottsbluff Jones went to Denver where he was inducted into the Marine Corps. The friends returned to Chadron, parked the 1949 Buick automobile in front of a newspaper office where Turpin was employed, and left the keys in the automobile. Three days later, on January 20, 1954, Turpin was driving the 1949 Buick when it was involved in an accident with a 1952 Studebaker pickup truck owned by Midwest Furniture and driven by Blanford, on U. S. Highway No. 20 approximately 2 miles east of Chadron. As a result of the accident the Studebaker pickup truck was damaged and Blanford was injured.

On January 21, 1954, Standard received notice of the accident. Thereafter suit was commenced by Blanford individually and as assignee of Midwest Furniture against Turpin. Standard received notice of this action. The action was tried, and on March 27, 1958, a verdict was rendered on two separate causes of action in favor of Blanford for the total amount of $6,473.35. Thereafter a motion for judgment notwithstanding the verdict, or in the alternative for a new trial, was overruled. No appeal was taken from this order, and the judgment against Turpin remains unpaid.

On March 18, 1954, G.M.A.C. secured a certificate

of title to the 1949 Buick in its name by repossession. It was covered by collision insurance, but Jones testified he did not receive any part of the collision settlement because the amount due and the value of the 1949 Buick, which was a total loss, were equal, and the collision loss was therefore paid to G.M.A.C.

The defendants assign as error that the trial court erred in declaring that the insurance contract between Standard and Jones extended to cover Turpin with respect to an accident involving only Turpin which occurred on January 20, 1954, after delivery of the automobile to Turpin under a contract of sale; the trial court erred in failing to declare that the contract of insurance between Standard and Jones was voided by the sale of the automobile involved to Turpin prior to the accident for the reason that thereafter Jones was not the sole owner of said automobile as required by the contract; that the judgment is not sustained by the evidence and is contrary to the evidence; and that the trial court erred in failing to prorate the loss between the Standard and Union contracts of insurance as required by clause 18 of both contracts.

The following sections of the statutes are involved in this appeal.

Section 60-104, R. R. S. 1943, provides in part: "No person, * * * shall sell or otherwise dispose of a motor vehicle, * * * without delivering to the purchaser or transferee thereof a certificate of title with such assignment thereon as may be necessary to show title in the purchaser, * * *."

Section 60-105, R. S. Supp., 1953, provides in part: "No person, except as provided in section 60-110, acquiring a motor vehicle, * * * from the owner thereof, * * * shall acquire any right, title, claim, or interest in or to such motor vehicle, * * * until he shall have had issued to him a certificate of title to such motor vehicle * * *. No court in any case at law or in equity shall recognize the right, title, claim, or interest of

any person in or to any motor vehicle, * * * unless evidenced by a certificate of title * * *."

Section 60-106, R. S. Supp., 1953, provides in part: "(1) Application for a certificate of title shall be made upon a form prescribed by section 60-114, * * *. (2) Such application shall be filed with the county clerk of the county in which the applicant resides, if the applicant is a resident of this state or, if a nonresident, in the county in which the transaction is consummated, and shall be accompanied by the fee prescribed in this act. (3) If a certificate of title has previously been issued for such motor vehicle in this state, the application for a new certificate of title shall be accompanied by such certificate of title duly assigned, unless otherwise provided for in this act. * * * The county clerk shall retain the evidence of title presented by the applicant and on which the certificate of title is issued. (4) The county clerk shall use reasonable diligence in ascertaining whether or not the statements in the application for a certificate of title are true by checking the application and documents accompanying the same with the records of motor vehicles in his office. If he is satisfied that the applicant is the owner of such motor vehicle and that the application is in the proper form, the county clerk shall issue a certificate of title over his signature and sealed with his seal, but not otherwise."

It is apparent that section 60-105, R. S. Supp., 1953, applies to individuals such as Turpin.

Standard's contract of insurance entered into with Jones, provides under "Declarations," item 1, that Jones is the insured. The contract further states that Standard agrees to pay on behalf of the insured all sums which the insured shall become legally obligated to pay for bodily injuries and property damage. The Union insurance contract contains the same provisions.

In section III of Standard's contract the definition of "insured" is as follows: "With respect to the insurance for bodily injury liability and for property dam-

age liability the unqualified word 'insured' includes the named insured and also includes any person while using the automobile and any person * * * legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission."

With reference to the Union insurance contract with Turpin, under section IV, "Automobile Defined," under subparagraph (3) "Temporary Substitute Automobile" is defined as follows: "under coverages A, B and C, an automobile not owned by the named insured while temporarily used as the substitute for the described automobile while withdrawn from normal use because of its breakdown, * * *." Union's contract defines "Newly Acquired Automobile" as "an automobile, ownership of which is acquired by the named insured who is the owner of the described automobile, if the named insured notifies the company within thirty days following the date of its delivery to him, and if either it replaces an automobile described in this policy or the company insures all automobiles owned by the named insured at such delivery date; * * *."

Section V of Union's contract provides: "Use of Other Automobiles: If the named insured is an individual who owns the automobile classified as 'pleasure and business' * * * such insurance as is afforded by this policy for bodily injury liability, for property damage liability * * * with respect to said automobile applies with respect to any other automobile * * *."

Standard's insurance contract provides: "18. Other Insurance—Coverages A, B, D, E, F, G, H, I and J: If the insured has other insurance against a loss covered by this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss; provided, however, the insurance with respect to temporary sub-

stitute automobiles under Insuring Agreement IV or other automobiles under Insuring Agreement V shall be excess insurance over any other valid and collectible insurance available to the insured, either as an insured under a policy applicable with respect to said automobile or otherwise."

The provisions of the Standard and Union insurance contracts relating to "temporary substitute automobiles," "newly acquired automobiles," the definition of "insured," and "other insurance coverages," above set out, are identical.

The defendants Standard and Jones contend that Turpin's use of the Buick automobile was not with the "permission" of Jones as used in Standard's insurance contract.

The "omnibus clause" appearing in the insurance contracts of Standard and Union is previously set forth.

In Nyman v. Monteleone-Iberville Garage, Inc., 211 La. 375, 30 So. 2d 123, it was held: "The 'omnibus clause' of automobile liability policy is for purpose of giving additional assureds other than person named in liability policy as assured, with certain limitations, the benefit of the policy, and it extends protection to one permitted to use automobile, although named assured may not be liable for accident under the doctrine respondeat superior."

The above-named defendants cite many cases relating to the above contention.

In the case of Farm Bureau Mut. Ins. Co. v. Emmons, 122 Ind. App. 440, 104 N. E. 2d 413, the action was brought by Robert Emmons and others to recover benefits under an automobile insurance policy issued by the Farm Bureau Mutual Insurance Company of Indiana to Louis Johnson. The facts, in substance, were as follows: On or prior to February 9, 1949, Johnson owned a 1947 Mercury automobile upon which he carried the insurance policy in question, which contained the following provision: "Coverage C-Medical Payments. To

pay to or for each person who sustains bodily injury, caused by accident, while in or upon, entering or alighting from (1) the automobile described in declarations, if the injury arises out of the use thereof by or *with the permission of the named insured.*" (Emphasis supplied.) On February 9, 1949, Johnson sold said automobile to Emmons on a conditional sales contract, by which Emmons agreed to make specified monthly payments and to pay for full coverage insurance. Johnson delivered possession and control of the car to Emmons on said date pursuant to the contract. Emmons had made monthly payments to Johnson, but on two occasions had failed to pay the full amount due. However, Emmons remained in control of the automobile up to May 8, 1949. The persons riding with Emmons at the time of the collision were his guests. After the collision occurred, Emmons notified Johnson. The automobile was repaired by the Farm Bureau Mutual Insurance Company, at its expense, and in October 1949, it was delivered to Johnson by the repairman. The questions were whether, when Johnson sold the automobile to Emmons under a conditional sales contract and Emmons took possession thereof under said contract, Johnson's possession and right to control the use of said automobile ceased and passed to Emmons; and whether thereafter Emmons' possession and use of the said automobile was by virtue of his ownership rather than by virtue of any consent or permission of Johnson.

Cited with approval upon this issue in the foregoing case was the case of Virginia Auto Mutual Ins. Co. v. Brillhart, 187 Va. 336, 46 S. E. 2d 377. This was an action against an insurance company on an automobile liability policy where the insured sold the automobile covered by the policy and gave the policy to the purchaser, but without any endorsement being made thereon changing the name of the insured. The plaintiff was injured in a collision after the sale of the automobile, and contended that, under the omnibus coverage provision

of the policy, protection was afforded to anyone who was using or driving the automobile with the permission of the named insured; that when the named insured sold the automobile and the purchaser took possession of it, this constituted a permission by the insured to the purchaser to use the automobile, within the meaning of the provision of the policy; and that hence its coverage was extended to the purchaser. It was held that there was no merit in this contention.

It was also held: " 'Permission' or 'consent' to use or drive a car within the meaning of an 'omnibus coverage' provision of an automobile liability policy must come from someone who was in a position to give or grant it, and his relation to or control over the car must be such that he has a right to give or withhold the permission or consent to use it."

We have read and analyzed all the cases cited on this proposition of law by said defendants, and it would serve no useful purpose to set forth the factual situations contained therein or the law applicable thereto. Suffice it is to say that all of such cases adopt the rule which appears in the annotation to 36 A. L. R. 2d 675, wherein it is said: "There are relatively few cases in which an action was brought under the omnibus clause against the insurer on the ground that the plaintiff was injured by an automobile driven by a conditional vendee of the insured. However, despite the dearth of authority the rule appears to be well settled that a conditional vendee does not use the insured automobile with the consent or permission of the conditional vendor and therefore is not within the coverage of the omnibus clause of an automobile liability insurance policy."

We conclude that the authorities above set forth are not applicable to the facts in the instant case or the law applicable to such facts. We deem the following to be applicable.

In the case of Loyal's Auto Exchange, Inc. v. Munch, 153 Neb. 628, 45 N. W. 2d 913, this court held that the

legislative act relating to title and transfer of motor vehicles constitutes an authorized exercise of police power on the part of the Legislature and does not violate any of the provisions of our state and federal Constitutions; that a purchaser who receives possession of an automobile without obtaining the certificate of title thereto, as required by our statute, acquires no title or ownership therein; and that a subsequent purchaser for value of the automobile, who obtains the certificate of title by complying with the statutory requirements relating thereto, obtains the title and ownership thereof, and his title and ownership are superior to any rights which the first purchaser may have. The opinion in this case quoted from Crawford Finance Co. v. Derby, 63 Ohio App. 50, 25 N. E. 2d 306. Ohio has an act like ours relating to transfers and titles to automobiles. As stated in Crawford Finance Co. v. Derby, *supra*: "On the other hand, from the whole scheme of the Certificate of Title Act, especially the sections quoted above (such as the sections previously quoted in this opinion), it is apparent that the Legislature intended to set up one and only one method by which liens on or titles to a motor vehicle could be acquired. To a purchaser, it makes a certificate of title issued by a clerk of courts (in this state county clerks) on a proper application, accompanied by the preceding certificate, either manufacturer's or owner's, the sine qua non to any right or title therein."

In the case of State Farm Mutual Auto. Ins. Co. v. Drawbaugh, 159 Neb. 149, 65 N. W. 2d 542, this court held: "The purpose of the act relating to transfers and titles to motor vehicles is to provide a means of identifying motor vehicles, to ascertain the owners thereof, to prevent theft of motor vehicles, and to prevent fraud. * * * A certificate of title of a motor vehicle is generally conclusive evidence in this state of the ownership of the vehicle. * * * The word 'owner' means one who has the legal title or rightful title, whether the possessor or

not. \* \* \* Statutes in pari materia should be construed together, and, if possible, effect be given to all of their provisions." This was a replevin action brought by the State Farm Mutual Auto. Ins. Co. against Loran Drawbaugh to obtain possession of a 1950 Chevrolet automobile. The Chevrolet automobile was purchased by Clarence Anderson from the Central Chevrolet Company at Grand Island. He received a manufacturer's certificate. A certificate of title was issued to him by the county clerk upon a proper application which conformed to section 60-114, R. R. S. 1943. Anderson had the automobile from June 27, 1950, to January 12, 1951. He parked it in front of his apartment in Lincoln on the evening of January 12, 1951, and the next morning it was missing. Anderson made claim against the State Farm Mutual Auto. Ins. Co., for the loss sustained either on January 13 or 14, 1951. State Farm Mutual Auto. Ins. Co. paid the loss and took a release and an assignment of the certificate of title as appeared on the reverse side thereof. The automobile was found in the possession of Drawbaugh at his farm home. Drawbaugh claimed to own the automobile and had obtained a certificate of title on May 16, 1951, from the county clerk of Butler County. The certificate of title was from one Deppe. The car was taken under a writ of replevin on February 27, 1952. After it was replevied it was sold to a dealer in Fremont. When the action was brought, State Farm Mutual Auto. Ins. Co. had only the assigned certificate of title from Anderson. This court, relying upon the case of Loyal's Auto Exchange, Inc. v. Munch, *supra,* held as above set forth.

We have read and analyzed the Ohio cases relative to transfers and titles to motor vehicles for the reason that the Nebraska and Ohio laws relating to such subject matter are identical, that is, insofar as the sections of the statutes of Nebraska heretofore set forth are concerned.

In the case of Mielke v. Leeberson, 150 Ohio St. 528,

83 N. E. 2d 209, 7 A. L. R. 2d 1342, the court held: "Under the plain and unambiguous language of Section 6290-4, General Code, a court cannot recognize the right, title, claim or interest of any person in or to any motor vehicle, without the production of a certificate of title or manufacturer's or importer's certificate duly issued in accordance with the Certificate of Title Law, and any other evidence of ownership is not of sufficient weight to sustain a verdict or judgment where title must be proved as a condition precedent for the validity of such verdict or judgment."

In Brewer v. DeCant, 167 Ohio St. 411, 149 N. E. 2d 166, it is said: "Under the Ohio Certificate of Title Act, a change in ownership of an automobile is not consummated until a certificate of title is issued in the name of the purchaser. * * * Where a purchaser contracts to buy an automobile and takes possession thereof from an automobile dealer and uses the automobile, such use is a use with the permission of the dealer until such time as a certificate of title thereto is issued to the purchaser."

In Garlick v. McFarland, 159 Ohio St. 539, 113 N. E. 2d 92, it was held that title to a Plymouth automobile in controversy did not pass to McFarland because the certificate of title had not been assigned, whereas this court, in State Farm Mutual Auto. Ins. Co. v. Drawbaugh, *supra,* held that not only must the seller's certificate of title be assigned, but the purchaser must have a new title issued in his own name before title and legal ownership is in the purchaser. Thus it would appear that there was a conflict in the Ohio and Nebraska decisions on this point, which was noted in the dissent in the case of State Farm Mutual Auto. Ins. Co. v. Drawbaugh, *supra.* However, from the later decisions cited from the Ohio courts heretofore set forth, it is obvious that the law of Ohio relating to transfers and titles to motor vehicles now follows Loyal's Auto Exchange, Inc. v. Munch, *supra,* and State Farm Mutual Auto. Ins. Co. v. Drawbaugh, *supra.*

While there is a contention on the part of the defendants Standard and Jones that the problem in the instant case turns on the construction of an insurance contract, that is, the Standard's contract of insurance, and not who was the legal title owner of the Buick automobile, and that section 60-105, R. S. Supp., 1953, does not purport to affect or to apply to any policy of insurance, in the case of Reinsch v. Pacific Mutual Life Ins. Co., 140 Neb. 225, 299 N. W. 632, it is said, quoting from McWilliams v. Griffin, 132 Neb. 753, 273 N. W. 209, 110 A. L. R. 1039: " 'It is settled that the laws which subsist at the time of making a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to and incorporated therein.' " See, also, Garlick v. McFarland, *supra*.

In the instant case there was not even an assignment of the Jones certificate of title to Turpin. In other words, although the defendants Standard and Jones contended a sale took place, no assignment of the certificate of title was accomplished, intended, or possible. The certificate of title was held by G.M.A.C. in its Denver office until the Buick automobile was repossessed by G.M.A.C. Jones was in fact the owner of the Buick automobile at the time the accident occurred. There was no conditional sale of the Buick automobile from Jones to Turpin. There is evidence that a contract was drawn wherein Turpin was to finish the payments on the Buick, and to the effect that he was the purchaser thereof. This contract was testified to from memory by a salesman of the Prey Chevrolet Company who testified that he drew the contract. It could not be found in the files of the Prey Chevrolet Company after diligent search made by counsel and the witness who testified to it.

Even assuming that there was such a contract, under the law of the State of Nebraska Turpin was not the owner of the Buick automobile and could not be until such time as he produced a certificate of title thereto as

set forth in the cases heretofore cited.

Referring to the facts, but not repeating them, we conclude that Turpin was driving the Buick automobile with the permission of Jones, the owner thereof, at the time of the accident, and that the Standard insurance contract extended to Turpin as provided for in such contract.

The defendants Standard and Jones contend that in any event the Union insurance policy must be prorated with the Standard insurance policy. We have carefully read and analyzed the cases cited by the defendants on this proposition of law. We conclude, however, that none of such cases contain "other insurance" clauses like the "other insurance" clauses in the Standard insurance policy and the Union insurance policy involved in the instant case. In the instant case the "other insurance" clauses appearing in the policies here involved, as previously stated, are identical. We make reference to clause 18 under "Conditions," "Other Insurance - Coverages" in both policies.

The case of American Automobile Ins. Co. v. Republic Indemnity Co., — Cal. App. 2d —, 341 P. 2d 675, deals with "other insurance" clauses such as are involved in the instant case. In this cited case reference is made to the case of Oregon Auto. Ins. Co. v. United States Fidelity & Guar. Co., 195 F. 2d 958. This case is discussed by defendants Standard and Jones in their brief, as well as other cases of like import. The court in American Automobile Ins. Co. v. Republic Indemnity Co., *supra,* pointed out that in the Oregon Auto. Ins. Co. case, *supra,* the "other insurance" clause in the owner's policy differed in that it wholly excluded coverage of a driver other than the named insured when the driver had other insurance. The discussion pertinent to this situation appears on page 678 of 341 P. 2d, as follows: "The 'other insurance' clause in American's policy is identical with that contained in the 'National Standard Automobile Policy,' used by the great majority of casu-

alty insurers in the United States. See Faude, The 1955 Revision of the Standard Automobile Policy, Coverage: Insuring Agreements and Exclusions, 1955 Proceedings of the Section of Insurance Law of the American Bar Association, p. 48. Although Republic did not use the standard form, its 'other insurance' clause is substantially the same as that appearing in the standard policy. That policy as well as the policies involved here extends coverage to the named insured when he drives a car other than his own and also to any other person when driving the car of the named insured. For that reason there will be dual insurance when an accident is caused by a person not driving his own car and both the driver and the owner are insured under a standard policy. Clearly the excess provision of the 'other insurance' clause is intended to show how the loss should be borne in this frequently recurring situation. It is impossible, and could not have been intended, that the excess provision would govern with respect to the insurance of the driver and that at the same time the prorate provision would control with respect to the insurance of the owner because proration of the loss and treating the driver's insurance as excess over the insurance of the owner obviously lead to inconsistent results. The only construction of the 'other insurance' clause under which both its parts will be meaningful is that the *excess* provision alone controls in every situation which falls within its terms, such as when a person is driving the car of another and both the driver and the owner have insurance, and that the *prorate* provision alone governs in all other situations, for example, when more than one policy has been issued to the same person. When the driver's insurance is excess, it necessarily follows that the insurance of the owner is primary, and therefore the owner's insurer must bear the entire loss to the extent of the limits of the policy." See, also, Firemen's Ins. Co. v. Continental Cas. Co., — Cal. App. 2d —, 339 P. 2d 602.

We have reviewed and analyzed the provisions of the Union insurance policy and the Standard insurance policy, especially clause 18, with reference to other insurance coverages. We conclude that the contention of Standard and Jones that the Union contract must be prorated with the Standard contract is without merit. Under the authorities heretofore cited it is apparent that Standard is required, under the facts in the instant case, to pay the loss as heretofore set forth.

We deem other contentions raised by the defendants Standard and Jones to be without merit.

For the reasons given herein, we conclude that the declaratory judgment rendered by the trial court should be affirmed.

AFFIRMED.