FARM BUREAU INSURANCE COMPANY OF NEBRASKA, A
CORPORATION, APPELLANT, V. ALLIED MUTUAL INSURANCE
COMPANY, A CORPORATION, ET AL., APPELLEES.

143 N. W. 2d 923

Filed July 8, 1966. No. 36266.

Jewell & Otte, for appellant.

Luebs, Tracy & Huebner, for appellees Allied Mut. Ins. Co. et al.

Tye, Worlock, Knapp & Tye and Jeffrey H. Jacobsen, for appellees Aetna Cas. & Sur. Co. et al.

Warren C. Schrempp, Richard J. Bruckner, and Carl E. Willard, for appellees Yount et al.

Heard before CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ., and COLWELL, District Judge.

SPENCER, J.

This is a declaratory judgment action brought by Farm Bureau Insurance Company of Nebraska, hereinafter referred to as Farm Bureau, to determine what coverage,

if any, was afforded defendant Howard L. Seager, hereinafter referred to as Seager, under insurance policies issued by Farm Bureau, Allied Mutual Insurance Company, hereinafter referred to as Allied, and Aetna Casualty and Surety Company, hereinafter referred to as Aetna.

The following outline of the facts will present the problems involved. Merle Palmberg, hereinafter referred to as Palmberg, while working on an Interstate Highway construction project approximately 10 miles from Lexington, Nebraska, was living with Seager and two other fellow employees at Lexington. About July 24, 1963, Palmberg purchased a 1962 Ford Thunderbird automobile, hereinafter referred to as Thunderbird, from a salesman for Albert E. Wells, doing business as Wells Motor Company, hereinafter designated as Wells, at Cozad, Nebraska. Palmberg traded in a 1956 Ford for which liability coverage was provided in a policy issued by Farm Bureau to Palmberg's parents. Three days subsequent to the accident from which this controversy arose, this policy was changed to provide coverage for the Thunderbird, and Palmberg, who had recently become 21 years of age, was included as a named insured with his parents.

As a part of the sales agreement in the purchase of the Thunderbird, Wells agreed to make certain repairs. Pursuant to previous arrangement, Palmberg delivered the car to Wells at Cozad about noon on Saturday, July 27, 1963. When he returned later in the afternoon, he was informed that the repairs could not be completed that day. Upon Palmberg's insistence that he needed an automobile to get back to Lexington, to go back and forth to work, and for a date, the salesman, with the permission of Wells, supplied him with a 1962 Ford Galaxie, hereinafter referred to as Galaxie, from the used car lot. The salesman affixed dealer's plates to the Galaxie and gave Palmberg a 48-hour dealer's permit made out in his name. Wells had coverage on this

automobile under a garage liability insurance policy with Allied. The salesman testified that when the Galaxie was delivered to Palmberg, no restriction was imposed as to his use, possession, control, or custody of it. No restrictions of any kind were even discussed. Palmberg testified in substance that he took it for granted he could treat the car as his own and could loan it to someone else if he wished.

About 5:30 a.m., July 28, 1963, when Palmberg returned from work, Seager, who was a foreman on the Interstate project and one of Palmberg's superiors, was just getting up. He appeared depressed and talked about his boy who had polio, and said that he wanted to go home for the day. Seager, whose home was at Lake Manawa, Iowa, had been furnished the exclusive use of a pick-up which he on occasions drove home. The pick-up furnished to Seager had been transferred by his previous employer to Missouri Valley Construction Company, the employer on the Interstate project, and was covered by the Aetna policy. Palmberg testified that Seager complained that the pick-up rode hard, and asked if his car was out in front. Palmberg told him it was being repaired, but that Wells had furnished him a car to use, he was welcome to use it if he liked, and Seager decided to take it. Seager's testimony is to the effect that he was going to use the pick-up but at Palmberg's insistence he took the Galaxie. Regardless of which version is accepted, Seager was using the Galaxie with the express permission of Palmberg.

Later that day, July 28, 1963, Seager, while operating the Galaxie owned by Wells and supplied to Palmberg, collided with an automobile owned and operated by Leonard C. Yount. Yount was injured in the collision and his wife was killed. He filed two actions against Seager, one individually and one as administrator of his wife's estate. Seager was subsequently convicted on a charge of motor vehicle homicide growing out of the collision.

The trial court specifically found that when the Galaxie was delivered to Palmberg it became a temporary substitute automobile; that Wells did not give express permission to Palmberg to loan or deliver possession of said automobile to anyone else, nor did he place any restrictions on its use by Palmberg; that Seager was using the Galaxie with Palmberg's express permission; and that Palmberg was not an occupant of the Galaxie when it was involved in the collision. The court then entered judgment that the Farm Bureau policy provided primary coverage to the Galaxie at the time of the collision, and that neither the Allied nor the Aetna policy provided any coverage. Farm Bureau perfected an appeal to this court.

Farm Bureau in its brief concedes that it is unable to make a case against Missouri Valley Construction Company, the employer of Seager and Palmberg, or its insurer, Aetna. No further reference will be made herein to either of those defendants.

Farm Bureau's assignments of error are directed to its contention that Allied should be held to have the primary coverage herein, and that the Farm Bureau coverage should be held to be excess coverage only.

The following pertinent comparable provisions from the two policies are of interest herein:

## FARM BUREAU

"Persons Insured. The following are insureds under Part I: (a) * * * (2) any other person using such automobile, provided the actual use thereof is with the permission of the named insured; * * *."

## ALLIED

"Persons Insured. Each of the following is an insured under Part I, * * * (3) With respect to the Automobile Hazard: (a) any person while using, with the permission of the named insured, an automobile to which the insurance applies under paragraph 1 (a) or 2 of the Automobile Hazards, provided such person's actual operation

or (if he is not operating) his other actual use thereof is within the scope of such permission, * * *."

Paragraph 1 (a) is as follows: "The ownership, maintenance or use of any automobile for the purpose of garage operations, and the occasional use for other business purposes and the use for non-business purposes of any automobile owned by or in charge of the named insured and used principally in garage operations, * * *."

## FARM BUREAU

"Other Insurance. If the insured has other insurance against a loss covered by Part I of this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss; provided, however, the insurance with respect to a temporary substitute automobile or non-owned automobile shall be excess insurance over any other valid and collectible insurance."

## ALLIED

"Other Insurance. If the insured, or with respect to Part II the claimant, has other insurance against a loss covered by this policy, the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

"The above provision shall not apply with respect to other insurance stated to be applicable to the loss only as excess insurance over any other valid and collectible insurance or on a contingent basis."

Additionally, there is attached to the Allied policy an endorsement covering customer rental, as follows: "In consideration of a premium charge of $21.51, it is agreed that such insurance as is afforded by the Policy for Bodily Injury Liability, for Property Damage Liability and for Automobile, Medical Payments applies with respect to any automobile while rented to a cus-

tomer of the named insured while such customer's automobile is temporarily left with the named insured for service or repair. The premium for this insurance shall not be subject to adjustment upon cancellation by the named insured."

It is apparent that the Galaxie was not an owned automobile under the terms of the Farm Bureau policy. The trial court determined that when the Galaxie was delivered to Palmberg, it became a " 'temporary substitute automobile.' " It is immaterial to a discussion herein as to whether the Galaxie is a nonowned automobile or a temporary substitute automobile, for the "Other Insurance" provision of the policy appears to apply as equally to one as to the other.

Before we have a problem as to who is the primary insurer, we must determine whether Seager is afforded coverage as an additional insured under the omnibus clause of both the Farm Bureau and the Allied policies. The policies provide coverage if he was using the Galaxie with the permission of the named insured. It is admitted that Seager was using the Galaxie with the express permission of Palmberg, who concededly would be covered under both policies. It is Farm Bureau's contention that if Palmberg had been driving the Galaxie, the Farm Bureau policy would not provide primary coverage upon the Galaxie if there were other collectible insurance. Its policy in that event would be secondary to the other collectible insurance, and therefore would provide only excess coverage.

In Turpin v. Standard Reliance Ins. Co., 169 Neb. 233. 99 N. W. 2d 26, we held: "Where two motor vehicle liability policies contained identical omnibus clauses relating to prorating of loss occurring under the provisions of such policies and a driver, not the owner of the motor vehicle, was driving it with the owner's permission and became involved in an accident resulting in injury and property damage for which a judgment was obtained against him, the insurance carried by such driver would

be excess over all other insurance, and the insurance carrier of the owner of the motor vehicle would be liable for the entire judgment sustained against the driver to the extent of the limit of such policy."

The trial court specifically held that Palmberg had not been given express permission to loan the Galaxie to any other person. There is no evidence in this record that Palmberg's parents, who were the named insureds in the Farm Bureau policy, gave him express permission to loan the 1956 Ford described in the policy, or any substitute automobile, to any person. Is express permission to loan essential to recovery under the two policies? We determine that it is not.

In Protective Fire & Cas. Co. v. Cornelius, 176 Neb. 75, 125 N. W. 2d 179, this court, recognizing the salutary purpose of the omnibus statute, decided it should be given a liberal construction to effectuate its purpose, and adopted what is known as the "initial permission rule" in the construction of the omnibus clause. In that case, we said: "The statute is remedial in nature and has for its purpose the protection of the public against damages resulting from accidents arising because of the negligent use of automobiles by irresponsible and noninsured permittees. The statute should be construed to accomplish the purpose and policy of the legislation. We must therefore reject the contention that the language of the omnibus statute means that the permission to use the car in a specified manner or for a specified purpose only bears upon the liability where permission to use the car is in fact given. Under this rule as stated in 5A Am. Jur., Automobile Insurance, § 99, p. 99, a deviation from the permitted use is immaterial, the only essential being that permission be given for use in the first instance."

Protective Fire & Cas. Co. v. Cornelius, *supra,* commits us to a broad rather than a narrow construction of the word "permission" as it is used in the omnibus clause. With this in mind, the following statement from 7 Am.

Jur. 2d, Automobile Insurance, § 116, p. 431, is enlightening: "It has frequently been stated that, as a general rule, the permission given by the named insured to another to use the named insured's car does not authorize the permittee to allow a third party to use the car, and that if the permittee does allow a second permittee to use the car, such use is not 'with the permission of the named insured' as those words are used in the omnibus clause. However, the effect of this strict rule has been greatly diluted by reason of the fact that many of the courts recognizing the rule have substantially modified it by stating that in every case where the first permittee permits another to use the insured automobile, a factual determination must be made whether the initial grant of permission was broad enough to include an implied grant to the permittee of authority to give another use of the automobile and thus render the latter an additional insured under the omnibus clause. *Many courts have even gone one step further and hold that where the named insured grants his permittee broad and unfettered dominion over his insured automobile, he also impliedly authorizes his permittee to allow a third person to use it, thus rendering the latter an additional insured.*" (Italics supplied.)

The record affirmatively shows that no restrictions were placed by Wells on Palmberg's use, possession, custody, or control of the Galaxie. When Palmberg was notified of the collision, he drove to Cozad to see Wells, and Wells told him: "* * * you shouldn't have borrowed a car to this fellow, but we should have told you not to."

Allied assumes that because Palmberg gave certain reasons to show his need for a car, that the use of the car he received was restricted to the uses he enumerated. Without more appearing, we do not believe the evidence will warrant that assumption. It is more logical to believe that the car was delivered for any purpose for which he would need to use a car. Palmberg had just pur-

chased and taken title to the Thunderbird 3 days before. At that time, he surrendered the possession of his old automobile. When the Thunderbird could not be repaired, he was told they would keep it over and let him use another car. He told them he would like to have a pretty decent one, and they gave him the Galaxie. This is not the usual situation where one borrows an automobile for a specific purpose. This is a business transaction, and must be interpreted in that light. The Thunderbird was to be repaired by Wells. He could not do it at the time agreed, so made other arrangements for Palmberg's convenience during the interim. The Allied policy had an endorsement permitting Wells to rent automobiles to those who brought them in for repairs. Here, Wells was obligated to repair the Thunderbird, and, because of the nature of the transaction, he saw fit to furnish Palmberg an automobile without making a rental charge.

We determine that the evidence justifies the conclution that Palmberg had the unrestricted use of the Galaxie. In the absence of restrictions otherwise, he could treat the Galaxie as his own. An owner has an absolute right to loan his automobile to another. Where an owner is entrusted with a substitute automobile while his own is in the possession of the lender, in the absence of something to the contrary in the agreement, he should enjoy broad and unfettered dominion over the substitute automobile. From Palmberg's use, under the circumstances, must flow an implied consent to the loan of the Galaxie, which would place Seager in the same situation as Palmberg, who had initial permission to use the automobile. See, Hardware Cas. Co. v. Massachusetts Bonding & Ins. Co., 129 N. Y. S. 2d 304; Krebsbach v. Miller, 22 Wis. 2d 171, 125 N. W. 2d 408, 4 A. L. R. 3d 1; and cases cited at 4 A. L. R. 3d 80. We determine that Seager was an additional insured within the provisions of both policies.

This brings us to the question of the nature of the lia-

bility between Farm Bureau and Allied. We have determined that Seager is included as an additional insured in the Allied policy, which provides coverage for the Galaxie. The Farm Bureau policy specifically provides: "* * * provided, however, the insurance with respect to a temporary substitute automobile or non-owned automobile shall be excess insurance over any other valid and collectible insurance."

There can be no question but that as to Farm Bureau the Galaxie was a temporary substitute or nonowned automobile. By its express terms, the Farm Bureau policy only becomes effective on the exhaustion of other valid and collectible insurance. We determine, therefore, that Allied, which provided coverage for the Galaxie, has the primary coverage for Seager. Allied, therefore, is principally liable to the full extent of its policy limits, and Farm Bureau has excess coverage to the extent of its policy limits. This is in harmony with our holding in Turpin v. Standard Reliance Ins. Co., 169 Neb. 233, 99 N. W. 2d 26, where the two liability policies contained identical omnibus clauses, set out heretofore.

For the reasons given, the judgment of the district court is reversed and the cause is remanded for the entry of a judgment in accordance with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.