316 So.2d 810 (1975)
Joseph GREMILLION
v.
Charles G. GOLEMAN et al.
Consolidated with Avery F. BROUSSARD
v.
Charles G. GOLEMAN et al.
Consolidated with VOLKSWAGEN INSURANCE COMPANY, as Partial Subrogee of Hezzie Parker
v.
Joseph W. MARTIN et al.
Nos. 10320, 10321 and 10322.
Court of Appeal of Louisiana, First Circuit.
June 30, 1975.
Rehearing Denied August 26, 1975.
*811 Alexander C. Cocke, Jr., New Orleans, John W. Greene, Covington, for plaintiff-appellee.
Iddo Pittman, Jr., Hammond, for defendant, State Farm Mutual Auto. Ins. Co., appellant.
Keogh & Keogh, Joseph F. Keogh, Baton Rouge, for defendants-appellees, Allstate Ins. Co. and William Parks.
John J. Hainkel, Jr., New Orleans, for defendant, Charles Goleman and Southern Farm Bureau Ins. Co., appellees.
Before SARTAIN, ELLIS and BARNETTE, JJ.
BARNETTE, Judge.
In these consolidated caess the plaintiffs seek recovery of damage arising out of an automobile collision which occurred in Mandeville, Louisiana on March 25, 1970.
In the first two cases (in order of their filing in the District Court), the plaintiffs, Joseph Gremillion, individually and on behalf of his minor son, Gregory, and Avery F. Broussard, individually and on behalf of his minor son, Charles, seek recovery of special damages individually and damages for personal injuries sustained by the minor sons, respectively. Defendants in those two cases are (1) Charles G. Goleman, (2) William Parks, (3) Joseph W. Martin and their respective liability insurers, (4) Southern Farm Bureau Casualty Insurance Company (Goleman's insurer), (5) Allstate Insurance Company (Parks' insurer) and State Farm Mutual Automobile Insurance Company (Martin's insurer).
*812 During the pendency of this litigation the minor sons, Gregory Gremillion and Charles Broussard, attained majority and have been substituted as parties plaintiff in their own behalf respectively.
In the third suit, Volkswagen Insurance Company, as partial subrogee of its insured seeks recovery of the stipulated amount of its loss, as insurer of Hezzie Parker, the owner of the Volkswagen involved in the accident in which Gremillion and Broussard were passengers. Made defendants in that suit are (1) Martin, (2) Goleman and their respective insurers, (3) State Farm and (4) Southern Farm.
The collision out of which these actions arose occurred at an intersection in the town of Mandeville between a Volkswagen automobile driven by Douglas W. Parker, son of Hezzie Parker, the owner of the Volkswagen, and a Ford Torino automobile owned by Joseph W. Martin, occupied at the time by Goleman and Parks. Whether Goleman or Parks was the driver of the Torino at the time of collision is one of the issues in the case.
The trial judge found as a fact that the driver of the Ford Torino was at fault and absolved the Parker youth and his passengers of contributory negligence. This factual finding is not seriously disputed and the evidence so clearly supports it that we will not discuss it further in this opinion.
The Court further found as a fact that Goleman was driving the Ford Torino and that Parks was riding with him. It found that Parks had permission of the owner of the Ford Torino, Joseph W. Martin, through his minor son, Charles P. Martin, and therefore, having the permission of the "named insured" under the State Farm policy, Parks and Goleman were insured under the omnibus coverage provisions of the policy.
Upon these factual findings the court rendered judgment in favor of Gregory Gremillion for personal injuries sustained, in the amount of $6,500 and to Joseph Gremillion for special damages $495.19. Judgment was rendered in like manner in favor of Charles Broussard for $3,500 and his father, Avery F. Broussard, $503.60. These judgments are cast against Goleman and his insurer, Southern Farm and State Farm (Martin's insurer) in solido, but specifically holding State Farm as the primary insurer and against whom alone the costs and judicial interest was assessed.
In the Volkswagen suit, judgment was rendered in plaintiff's favor in the stipulated amount of $962.40, with judicial interest and cost against State Farm (Martin's insurer) and Goleman and his insurer, Southern Farm, but specifically holding State Farm to be the primary insurer.
By previous order the Gremillion and Broussard actions against Martin personally had been dismissed.
In each of the three cases a suspensive appeal was taken by State Farm (Martin's insurer). Neither Goleman, individually, nor his insurer, Southern Farm, has appealed. No answers to the appeal were filed by any interested party.
The principal issue in these appeals is whether Parks and Goleman were using the Martin Ford with permission of the "named insured" so as to bring them within the omnibus coverage provisions of the State Farm policy.
The pertinent provisions of the State Farm policy issued to Joseph W. Martin are as follows:
"Persons Insured. The following are insureds under Part I [Liability]:
(a) With respect to the owned automobile,
(1) the named insured and any resident of the same household,
(2) any other person using such automobile with the permission of the named insured, provided his actual operation or (if he is not operating) his *813 other actual use thereof is within the scope of such permission, * * *"
Under the heading "Definitions Under Part I" is the following definition of the named insured:
"named insured means the individual named in Item 1 of the declarations and also includes his spouse, if a resident of the same household; * * *."
The individual named in Item I is "Martin, J W". Therefore, by strict interpretation of the foregoing definition of "named insured" it is either J. W. Martin or his spouse, Mrs. Martin.
In Rogillio v. Cazedessus, 241 La. 186, 127 So.2d 734 (1961) the Supreme Court held that a policy provision identical to that in this case should be given strict application and that permission necessary to extend coverage to a non-owner-user of the automobile could be given "only [by] the named insured or his spouse." In this case that would be only J. W. or Mrs. Martin. That case also distinguished the son as an additional insured, as a member of the named insured's household, from a permittee in the strict sense. The same distinction would apply here to the son Charles Phillip Martin.
Notwithstanding the clear import of its decision in Rogillio v. Cazedessus, relative to strict application of the term "named insured" in the later case of American Home Assurance Company v. Czarniecki, 255 La. 251, 230 So.2d 253 (1969) the court extended the authority of the "named insured" to a minor son who was for all intents and purposes the owner of the automobile with unrestricted use privileges, even though it was registered and insured in his fathers name. In extending the authority of the "named insured" in that case to the stepson, the Court expressed the restraint which should be used in extending by implication the clear and unambiguous terms of the insurance policy. It said:
"Thus, where an effort is made to imply permission in these cases, the realm of speculation is inevitably involved to some extent. Implying permission, as in other contractual implications, is, essentially, nothing less than a judicial extension of the terms of an obligation by reading into language a meaning which is not clearly expressed. It is, in effect, a rewriting of the contract between the parties and, a fortiori, a rewriting of the law which they have made for themselves. It is an authority to be most carefully exercised calling for a proper restraint by courts. La.Civ.Code. arts. 1901, 1903."
This, in our opinion, is a case in which to apply that restraint.
The pertinent provisions of the Southern Farm Bureau policy insuring Goleman relating to coverage are as follows:
"(d) a non-owned automobile while being operated by the named insured [Goleman]; * * * but shall not include:
"(3) any automobile while being used without the permission of the owner. (Emphasis added)
Therefore, in order for State Farm to be liable, the evidence must show that Parks (as the user) and Goleman (as operator) had permission, express or implied, from J. W. or Mrs. Martin to use the Ford Torino. For Southern Farm Bureau to be held liable, the evidence must show that its insured, Goleman, was actually operating the non-owned automobile and that he was doing so with the permission of its owner, J. W. Martin.
Parks and Goleman were unknown to J. W. and Mrs. Martin, and clearly no express permission was given by either of them, the "named insureds," for Parks or Goleman to use the automobile in question. Their permission to use it must be found by implication through the alleged permission given to Parks by Charles Phillip Martin, the minor son of J. W. and Mrs. Martin, under the rationale of the Czarniecki *814 case. The authority of that case cannot be extended to apply to the factual situation before us.
As indicated above, there is no serious dispute that the cause of the accident was the negligence of the driver of the Ford Torino occupied at the time by Parks and Goleman. Both Parks and Goleman were very drunk at the time. So much so, in fact, that they did not seem to know which of them was driving. They each allege that the other was driving and that dispute continues between them to this stage of the proceeding. The trial judge found in written reasons for judgment that Goleman was the driver. It would serve no useful purpose for us to review the testimony on this issue and the circumstances to which the trial judge pointed in reaching the conclusion that Goleman was driving. The evidence clearly supports his finding of fact on this issue and we will not disturb it.
There is no claim that Goleman personally had permission of the owner or the owner's son to drive the car. Permission must therefore come through Parks, as user of the car with permission. First, there is the question whether the minor Charles Phillip Martin was restricted in the use of the car by his parents, to the extent that he was without authority to grant permission to another person to use it. This will determine if the rationale of the Czarniecki case is applicable. Secondly, there is conflicting testimony whether Charles Phillip Martin gave permission expressly or by implication for Parks to use the automobile.
The pertinent facts are:
Charles Phillip Martin was a 19 year old youth who lived at home with his parents, Mr. and Mrs. J. W. Martin, in Kinder, La. He was employed as a crewman working on a dredge operating in Lake Pontchartrain. His work schedule required that he drive from his home in Kinder to Mandeville. There he would park his car and board a crewboat operated by the defendant, Parks. Parks would transport the crewmen to the barge and dredgeboat operations some miles from shore in Lake Pontchartrain. The crew would remain on the barge and dredgeboat fourteen days at the end of which Parks would transport them back to the dock at Mandeville. There the crewmen would return to their respective vehicles for return home. They would be off duty for seven days and then return for another fourteen day shift on the dredgeboat.
For an unspecified time Charles Phillip Martin had used a Ford Mustang automobile owned by his father for his means of transportation from his home in Kinder to Mandeville. On every occasion except one when the Mustang was left at Parks' home, he left it at a Phillips 66 Service Station. When the Ford Torino was purchased he made one trip to Mandeville and left the new car at the Phillips Service Station where it was parked under a tree until his return. Droppings from the tree stained the top of his new car so on the next trip to Mandeville (seven days later) he left the new Torino at Parks' home, locked it and gave the keys to Parks. He was then transported by Parks on the crewboat to his place of work in the Lake. Two or three days later Parks took the new Ford Torino with his friend Goleman as a passenger to a nearby tavern. Parks had already had an unspecified number of drinks at home. He and Goleman had more drinks at the tavern and both became highly intoxicated.
On returning home from the tavern Parks became sick as a result of over-in-dulgence and stopped the car. At this point he asked Goleman to drive him home. Goleman went by his home first for personal reasons and within a few minutes continued on driving toward Parks' home. It was then in making a left turn in front of the Volkswagen the collision occurred.
The Volkswagen owned by Hezzie Parker was being driven by her son, Douglas *815 Parker. The Gremillion and Broussard youths were passengers in the Volkswagen driven by Parker.
The trial judge found for obvious reasons that the accident was the result of the negligence of the driver of the Ford Torino and that there was no contributory negligence on the part of Parker or his guest passengers. Without further discussion of the details of the accident we find the judgment in this respect to be entirely correct and not seriously disputed.
The Martin family owned an El Camino which Mr. Martin principally used; a station wagon used principally by Mrs. Martin and the Mustang referred to. All members of the family, old enough to drive, used and drove all the automobiles on occasions and as necessary, however, with regard to the convenience of other members of the family. Another son was returning home from military service and it was decided to let him have primary use of the Mustang and buy the new Ford Torino for the use primarily, but not exclusively, of the son, Charles Phillip, as his means of transportation to and from Mandeville. Charles Phillip selected the car and went with his father when the purchase was negotiated. The car was bought in the name of the senior Martin and registered in his name as owner. The father, Joseph W. Martin, subscribed to a Credit Life Insurance Certificate to secure the unpaid balance of the purchase price. Liability insurance was obtained from State Farm by J. W. Martin as the named insured. The purchase and registering of the automobile in the name of the senior Martin was because of the minority of Charles Phillip.
Charles Phillip and his mother had a joint checking account from which certain payments on the car were made. The testimony and other evidence leaves no doubt that the obligation for payment of the purchase price of the new car was primarily that of the senior Martin but Charles Phillip was to contribute to payment from his earnings as he could. The evidence clearly supports the conclusion that all the automobiles were used by all the members of the family and that all of them shared in the expense and upkeep. This distinguishes this case from Czarniecki in which the minor son alone paid for and bore all the cost of maintenance and operation.
There is much testimony in the transcript by the Martins to support their contention that Charles Phillip did not have broad and unrestricted permission to use the car. They testified at length about admonitions given to Charles Phillip not to let other persons drive. Their testimony is entirely reasonable and believable. The trial judge found as a fact, however, that Charles Phillip did have broad and unrestricted permission and authority to use the car as his own to bring this case within the authority of Czarniecki. We do not agree and must hold to the contrary.
The evidence does not support the conclusion that Charles Phillip Martin was, as in Czarniecki, vested with broad and unrestricted privilege in the use of the car to clothe him with the authority of the named insured to extend omnibus insurance coverage to a permittee in the operation or use of the automobile. A strict application of the very specific provisions of the State Farm policy as was done by the Supreme Court in Rogillio v. Cazedessus, supra, does not extend coverage to Parks or Goleman. We find no reason under the facts presented here to make an exception as was done in the Czarniecki case. In that case the Supreme Court said:
"Although Jesse G. Waters was the named insured, the permission and authority delegated by him to Randy for the use of the car was so broad and so free of restrictions that it may safely be said that Waters delegated to Randy whatever authority he had to grant permission to others to drive the car. This circumstance, together with the uncontested *816 fact that the automobile was paid for by Randy and the cost of its maintenance and operation was entirely borne by him from his earnings, places Randy in the position of the named insured clothed with all of his authority and rights under the policy.
"Randy, then, was fully authorized to use the car as his own. This permission carried with it the right to grant permission to others to drive and use the car. When Randy loaned the car to Hans Gerteis, therefore, the operation of the car by Gerteis was, in legal contemplation, `with the permission of the named insured' * * *." 230 So.2d at p. 256-7
That is not the factual situation before us and we therefore hold that under the unambiguous provisions of the policy only J. W. Martin or Mrs. Martin had authority to extend coverage to a non-owner-user or the automobile with permission.
This court in Lee v. Allstate Insurance Company, 274 So.2d 433 (La.App. 1st Cir. 1973) and Devall v. State Farm Mutual Insurance Company, 249 So.2d 282 (La.App. 1st Cir. 1971), under very similar factual situations held that the minor son of the named insured had no such broad, free or unrestricted use as that found by the Court in the Czarniecki case. There is a close parallel factually between those cases and the present one.
We find that the permission of J. W. and Mrs. Martin to their son, Charles Phillip, to use the car was restricted within limits which all the family understood and by which they were privileged to use all the family owned automobiles. We do not find that Charles Phillip violated these restrictions. Hurston v. Dufour, 292 So.2d 733 (La.App. 1st Cir. 1974) writ refused 295 So.2d 178 (La.1974).
Since young Martin did not have the authority of the "named insured" to grant permission to Parks, so as to extend coverage, it is not necessary to consider whether implied or tacit permission was given by him for Parks to use the car. We will, however, do so to give an additional reason for our ultimate decision.
There is testimony to show that it was customary for dredgeboat employees to leave their vehicles at Parks' home when he transported them on his crewboat to their places of work in the Lake. They always left the keys in Parks possession in order that he might move them as necessary or if some emergency should arise. At times there were as many as six or seven such vehicles in Parks possession.
Three other dredgeboat crewmen testified about leaving their vehicles in Parks' possession during their fourteen day shift in the Lake. Sibley Ardoin testified that he now leaves his pickup truck at the Phillips 66 Service Station, and leaves the keys in order that it can be serviced and ready for him upon his return. He testified that he had previously on many occasions left the truck with the keys with Parks but discontinued doing so when he discovered on one occasion it had been used by someone to haul fertilizer. He testified that he had never discussed permission to use or not to use his truck with Parks. He knew that it had been moved on occasions, probably to facilitate grass cutting. On occasions Parks would bring the truck to the dock for his convenience when returning from a work shift. He did not object to that but said he did not want Parks to "use it as his own." He discontinued that arrangement after the fertilizer hauling incident. This is clearly indicative of his objection to the use of his vehicle by Parks.
Lester Lejeune, another dredgeboat crewman, testified that he had been leaving his car with Parks about four years. He never had a specific discussion with Parks about the use of his car and said:
"* * * I never did tell him not to drive it. Told him to take care of it."
He had knowledge that Parks had used "different ones [vehicles] at different *817 times" and understood that Parks used his car at times.
Another workman, Robert Bruce Finley, testified that he left his pickup truck with Parks and had knowledge that Parks drove it "back and forth" and that he had his permission to do so. He said he had knowledge of Parks having used other vehicles left in his care.
Parks testified about his use, on a local basis only, of vehicles left by workmen in his care. He further testified that Charles Phillip Martin gave him permission to use his car, saying "use it like it is your own, Bill." We seriously doubt that young Martin made this statement particularly in view of the fact that the Ford Torino was new, only a month old, and in all probability young Martin was very proud of it and wanted it fully protected. That is the reason he discontinued parking it under the trees at the service station.
Charles Phillip Martin was questioned at length on the question of permission. The substance of his testimony is that he never had a discussion with Parks one way or the other on his use of the car. He acknowledged that he knew Parks "could" use the car but did not think he "would" do so. The testimony of Martin on this point seems to be more likely true that the testimony of Parks that he was to use the new car as his own.
Whether or not a tacit or implied permission can be assumed with respect to the use of vehicles belonging to other dredgeboat employees, an inference cannot be extended to Charles Phillip Martin in the absence of any evidence that such was the custom and known and consented to by Martin. There is no such evidence in the record.
We therefore find as a fact that Charles Phillip Martin left the keys with Parks as a precautionary measure to fully protect the car in event of an emergency. Implied consent to move the car on Parks premises to facilitate grass cutting or movement of other vehicles may be assumed but no more. It is contrary to reasonable assumption that young Martin would turn over the use of his new automobile to Parks or anyone else to use during his fourteen days on the Lake. By no stretch of imagination can it be assumed that he gave permission for Parks to take the new car out on a drinking spree with friends.
The credibility of Parks and the weight to be given to his testimony should be considered in the light of his self-interest to avoid personal liability.
Our jurisprudence indicates the extent to which the courts have gone in finding implied permission to bring the user of a non-owned automobile under the omnibus coverage of the owners liability insurance policy. The test of permission was well stated in Wolfe v. Employers Commercial Union Insurance Co., 272 So.2d 714 (La. App. 3d Cir. 1973), in the following language:
"Generally, implied permission arises from a course of conduct by the named insured involving acquiescence in, or lack of objection to, the use of the vehicle. All of the facts and circumstances must be considered. * * *" P. 715.
Proof of permission to bring a non-owner-user of an insured automobile within the liability insurance coverage must be established by the plaintiff by a preponderance of the evidence. This may be express, or implied from the circumstances. McConnell v. Travelers Indemnity Company, 248 La. 509, 180 So.2d 406 (1965); Wolfe v. Employers Commercial Union Insurance Co., supra; Guidry v. Rhodes, 238 So.2d 248 (La.App. 3d Cir. 1970).
Several cases have been brought to our attention dealing with the question of permission. We find that they have been decided according to the facts and circumstances peculiar to each case, and all applying *818 the foregoing principles. They have no particular relevance to the facts and circumstances presented in this case. We cite some of them merely for comparison or to distinguish factually. Rawls v. I. & M Poultry, Inc., 273 So.2d 340 (La.App. 1st Cir. 1973), writ refused 274 So.2d 708 (La.1973); Revolta v. Allstate Insurance Company, 273 So.2d 645 (La.App. 4th Cir. 1973); Bagnell v. Travelers Insurance Company, 270 So.2d 255 (La.App. 4th Cir. 1972); Lusk v. Travelers Insurance Co., 250 So.2d 197 (La.App. 1st Cir. 1971).
There is nothing in the course of conduct in this case to support a finding of implied or tacit consent by Charles Phillip Martin for Parks to use the automobile for his personal pleasure and convenience.
The burden of proof of permission is upon those whose interest would be served thereby. In this case it is the plaintiffs and Parks and Goleman. They have not discharged that burden by a preponderance of the evidence. Holden v. Transamerica Insurance Company, 222 So.2d 302 (La.App. 1st Cir. 1969), writ refused 254 La. 759, 226 So.2d 522 (1969).
We therefore hold that the State Farm Mutual Automobile Insurance Company's insurance coverage was not extended to cover Parks and Goleman. State Farm, therefore, has no liability for the damage caused by their negligence.
Parks as the non-permitted user of the automobile, was grossly negligent in its use and control in turning over its operation to a person known to him to be highly intoxicated. His negligence in this respect could not be seriously disputed. Nor could it be denied that his negligence was a primary and contributing cause of the accident. Whether or not Parks should have been cast in the judgment personally as a joint tort-feasor or his insurer, Allstate, are questions we do not have to decide since none of the plaintiffs appealed the judgment which dismissed their suits against Parks and Allstate. They are not before this court.
The only party who appealed was State Farm. It has no interest in this appeal except to have its own liability reversed. As the primary insurer it has no interest in the secondary liability of any other defendant. If it is not liable, plaintiffs' failure to appeal the dismissal of other defendants who might have been cast, is of no concern to State Farm. Hence the only issue vel non as to liability before us is that of State Farm.
The issues of liability of defendants not cast below are not brought to us on this appeal by State Farm since the appellant has no interest contingent upon or in conflict with the other defendants. Either State Farm is liable as the primary insurer or not liable at all.
The Court below found as a fact that Goleman was driving and therefore cast him in judgment. He did not appeal, hence the judgment is final as to him. His insurer, Southern Farm Bureau, was cast under the provisions of its policy on the finding of fact that Goleman was driving with permission of the named insured. Southern Farm Bureau, having not appealed, the judgment below is final as to it, notwithstanding our decision that its insured was driving without permission of the named insured.
The appellant, State Farm, raised the issue of quantum of damages on this appeal. Having held State Farm to have no liability and none of the other defendants having appealed, and plaintiffs having not answered the appeal, we do not reach the issue of quantum.
The only appellant before us is State Farm Mutual Automobile Insurance Company. The judgments below insofar as they relate to the other defendants have not been appealed, and will not be affected by our decree.
*819 The judgments in favor of Joseph Gremillion and Gregory Gremillion and in favor of Avery F. Broussard and Charles Broussard and in favor of Volkswagen Insurance Company insofar as they were appealed in these consolidated cases are reversed and set aside and there is now judgment in favor of State Farm Mutual Automobile Insurance Company and against the plaintiffs, appellees, in each of the consolidated cases respectively, denying recovery and dismissing their suits as against State Farm Mutual Insurance Company. The plaintiffs, appellees, are cast for all costs of this appeal and for such cost of the trial court as were assessed against State Farm Mutual Automobile Insurance Company.
Reversed and judgment rendered.