MFA INSURANCE COMPANIES, APPELLANT, V. JOHN L. MENDENHALL ET AL., APPELLEES.

288 N. W. 2d 270

Filed February 5, 1980. No. 42509.

Harold W. Kauffman and William J. Dunn of Gross, Welch, Vinardi, Kauffman, Day & Langdon, for appellant.

Harry R. Henatsch of Katskee & Henatsch, for appellee West American Ins. Co.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

HASTINGS, J.

This is a suit for a declaratory judgment. The plaintiff, MFA Insurance Companies (MFA), seeks a determination as to whether or not its policy of automobile liability insurance issued to Janet T. Peery (Janet) on her 1974 Volkswagen extended to cover her sister, the defendant Sharon Peery (Sharon), as an additional insured while the latter was operating the automobile on February 24, 1978. At that time Sharon became involved in an accident in which Mendenhall, Joseph P. Menichetti, and West American Insurance Company, Mendenhall's collision carrier (defendants), sustained damages. The trial court found that MFA's policy did provide Sharon with liability insurance coverage as an insured under its omnibus clause. Plaintiff has appealed and we reverse.

Although a suit for declaratory judgment under section 25-21,149 et seq., R. R. S. 1943, is an action sui generis and may involve questions of both law and equity, the particular decision from which this appeal is taken involves at the outset a question of fact. As such, the parties were entitled to a jury trial. § 25-21,157, R. R. S. 1943. State Farm Mutual Automobile Ins. Co. v. Kersey, 171 Neb. 212, 106 N.

W. 2d 31 (1960). However, the record indicates that this case was tried to the court without a jury and where, as here, there is no indication of protest or objection on the part of either litigant, the court will presume that a jury was waived. State Farm Mutual Automobile Ins. Co. v. Kersey, *supra*. In such a case, the judgment of the trial court has the effect of a verdict of a jury and will not be set aside unless clearly wrong. State Farm Fire & Cas. Co. v. Muth, 190 Neb. 248, 207 N. W. 2d 364 (1973).

The evidence at trial consisted of the policy of insurance and the depositions of Janet and Sharon taken by the attorneys for the defendant, West American Insurance Company. The pertinent portion of the policy involved in this litigation is as follows: "With respect to the insurance afforded * * * the following are insureds: * * * any * * * person using such automobile with the permission of the named insured * * * provided his actual operation * * * is within the scope of such permission * * *."

Janet testified she is now single, has a small daughter, owns the automobile in question, and lives about 2 or 3 miles from her sister Sharon. Sharon is 26 years old, single, and the two are friendly and socialize with each other. Prior to February 24, 1978, Janet had let Sharon practice her driving with Janet's car as long as she also was in the car. She said Sharon did not practice driving with Janet's car when she was not along. Janet picked up Sharon on occasions to take her different places, including grocery and clothing shopping, and to see their other sisters. Sharon did not do any of the driving on those occasions that Janet could remember. Janet did not remember any occasion before the accident when she let Sharon take the car for her own use when she was not along. The day before the accident Janet had taken her daughter to Sharon's house to leave her because Janet was going out of town for the weekend. Janet had given Sharon her keys to

the house in case Sharon had to get the little girl some clothes or something from the house. All of her keys, including the car keys, were on the same ring. She had left her car parked in front of her house, and then left on her trip with friends.

Janet thought she and Sharon had discussed whether or not Sharon could use the car while Janet was gone. She didn't say what was said, but did testify that before this time she had specifically told Sharon when she had asked to use the car that she could not do so. She said that before February 24, 1978, she had never allowed Sharon to take the car by herself and drive it. When pressed for a reason why she wouldn't let Sharon drive, she said "I just didn't want her to drive it." Janet had let her other sister, Barbara, drive the car whenever Barbara asked, but to the best of her knowledge whenever Barbara had the car Sharon never drove it. Janet finally said that if they would have discussed Sharon's using the car while she was gone she would have told Sharon no, she couldn't use it. "It's, you know, with her, with her driving in the car with me before I just felt that I didn't want her to drive the car without me in it. That's all. It was a personal matter between me and her."

According to Sharon's deposition, she had driven Janet's car on several occasions before the accident, but only with Janet or her sister Barbara in the car. These would be short trips to the doctor's office or to the nearby shopping center. The greatest distance she had ever driven the car by herself was the night of the accident when she took the car to go to a show. In answer to a question, "Well, were there shorter drives by yourself when you were all alone?" she answered, "Maybe to the drugstore and back, but that's like in Baker's shopping center, but that was about it." She was then asked, "Did that pattern of driving that you told us about, did that continue from June of '77 until the date of this accident?"

to which she replied, "No. I didn't drive that much with the car, but I did just go, like we were just talking, like maybe to the store and drugstore, this and that." And a further question, "It was just the short trips?" and the answer "Yes. She wouldn't let me go anywhere, just if we were going to the store, the drugstore, that was about it. Most of the time I would drive or she or my sister Barbara, but no other trips." Finally, in this area, the following questions and answers were asked and given: "Q. Well, had you taken the Volkswagen alone, Sharon, to go get groceries at Baker's or Hinky Dinky prior to this accident? A. No. Janet would come and get me and we would go together. Q. The drugstore would be the only exception? A. Yes. Q. Where you would take it alone? A. Yes."

In describing the events leading up to the accident, Sharon told how Janet had brought her little girl Leslie over to her house. "* * * And she brought her Thursday evening over to my house, and she left her car at her house, but I had the keys to the house and the car, so I could go check on the house. So Friday evening I came home from work and I had a friend take me over to Janet's house and I picked up the car from there. Then I went to the show from there, and that was about four-thirty or five o'clock that evening."

When questioned about whether or not there was any discussion between her and Janet about using the car on this occasion, she said, "No. Only that not to use the car. * * * Q. Are you sure she talked to you about that? A. Well, usually — Q. But it's not 'usually' I'm asking about, I'm asking about this particular evening? A. Yes. * * * I don't remember if we discussed it, but she left her car at the house and she just told me to check on the house. * * * The car, we didn't discuss anything about the car, but I just took it as not to use the car because it was parked in front of her house." Then continuing,

"Q. Well, on those occasions when you would drive it alone to the drugstore, would it not be parked at her house then? A. No, she would come and bring the car to me. * * * Then I would drive from my house to her house and then I would go to the drugstore and bring the car back to her house and she would take me back home." Sharon went on to testify that this happened once a month or less when she would drive the car to the drugstore by herself to get her insulin. She could remember only one occasion when she drove to the doctor's office by herself.

On cross-examination by the attorney for the other defendants, Sharon testified for the first time that although this was the first time she had ever taken the car without permission, she assumed Janet would not care. Later on she said, "I still can't remember if we talked about it or not. But the car was parked at her house and that, from that understanding I got that I wasn't supposed to use the car, just to check on her house and that was about it." Sharon admitted to having told a representative of the plaintiff on March 1, 1978, that Janet did not give her permission to use the car on this particular occasion, and that she had never been permitted to use the car without Janet or Barbara being along.

The trial court cites the case of Arndt v. Davis, 183 Neb. 726, 163 N. W. 2d 886 (1969), for the proposition that Nebraska is committed to the "liberal or initial permission" doctrine, which it applied to this case. We think that reliance is misplaced. Arndt v. Davis, *supra,* and the cases it cites, refers to a situation where a person has been given unterminated permission to use a vehicle for a specific purpose or with defined limitations, but thereupon uses it for a purpose which is particularly forbidden or not especially authorized. The theory of that doctrine is at least twofold. In the first place, the use for which original consent was given continues, even though there is a temporary deviation from or abandonment

of that purpose. Secondly, and from a strictly public policy standpoint, the insurance company whose insured made it possible for the claimed unauthorized act by placing possession of the auto with that person should pay the damages. However, the cited case does not hold that once an insured automobile owner has given another permission to use the vehicle for a specific purpose on a particular occasion, every use thereafter, even without the owner's knowledge or permission, is authorized. This is not to say there cannot be implied permission so as to activate coverage under the omnibus clause.

State Farm Mutual Automobile Ins. Co. v. Kersey 171 Neb. 212, 106 N. W. 2d 31 (1960), was cited in Arndt v. Davis, *supra,* as supporting the strict rule doctrine. However, the analogy was inappropriate because, as has been pointed out earlier, the latter case involved a use for an unauthorized purpose during a permissible possession which had not been terminated. The former case, on the other hand, presented a true implied permission question, absent any initial permission, and with facts similar but much more favorable to defendants' position here, the court found no coverage. In that case, the insured's minor daughter was driving his automobile without specific permission, when she was involved in an accident on August 31, 1956. The findings of fact made by the trial court and in support of which there was substantial relevant evidence included the following: The daughter had driven the automobile alone on July 4, 1956, in Overton, Nebraska, with the permission of her father; she drove the automobile alone, with the permission of her father, in Smithfield, Missouri, during the summer of 1955; she drove the automobile a number of times on country roads and streets near and in Elm Creek, Nebraska, during the year preceding the accident, with her father in the car giving her driving lessons; she drove the automobile back and forth on the fam-

ily driveway, both with and without the express permission of her father, 12 to 15 times before the accident; her father had knowledge that she was driving on the family driveway and never objected; and the father did not notify his daughter she was not to drive the car at the time the accident happened. Nevertheless, the trial court found the evidence in the case neither expressly or impliedly granted the daughter permission to drive other than in the company of her father, and found there was no coverage afforded to the daughter under the omnibus clause of the insurance policy. In doing so, this court said: " 'Permission or consent may be implied. Thus permission is not limited to that expressly granted, but may arise and be implied from a course of conduct pursued with knowledge of the facts for a considerable time, as where there is a prolonged, frequent, and habitual use with the knowledge and acquiescence of the owner, which must be regarded as a "permission" within the policy. But no implication arises from use on a specific occasion for a specific purpose by the insured or one of his household of permission to others to operate the automobile even for a use closely connected and related in purpose and time, and permission to use the automobile for a given purpose does not imply permission to use it for all other purposes.' " Recognizing the modifications imposed by the "liberal or initial permission" doctrine of Arndt v. Davis, 183 Neb. 726, 163 N. W. 2d 886 (1969), it might be more accurate to say that permission granted for limited specific purposes on isolated occasions does not imply general permission to use an automobile for purposes wholly unrelated in time, character, or circumstances.

Although finding against the insurance company on disputed facts, Bourne v. Manley, 435 S. W. 2d 420 (Mo. App., 1968), laid down the following rules: "We recognize that one relying upon implied permission must prove it, that no implied permission

arises merely because someone obtains possession of a vehicle and uses it without the knowledge of the named insured, and that the permission contemplated by the omnibus clause is something more than mere sufferance or tolerance without taking steps to prevent, that term being used rather in the sense of leave, license or authority with the power to prevent. * * * It may and usually does arise from a course of conduct of the parties over a period of time prior to the use in question." To the same effect is Cooper v. Firemen's Fund Ins. Co., 252 So. Car. 629, 167 S. E. 2d 745 (1969): "Implied consent involves an inference arising from a course of conduct or relationship between the parties, in which there is mutual acquiescence or lack of objection under circumstances signifying assent. * * * However, permission requires something more than mere sufferance or tolerance without taking steps to prevent the use of the automobile and permission cannot be implied from possession and use of the automobile without the knowledge of the named insured." See, also, National Farmers Union Prop. & Cas. Co. v. Ronholm, 153 N. W. 2d 322 (No. Dak., 1967); Whelchel v. Sommer, 413 F. 2d 521 (8th Cir., 1969); Gremillion v. Goleman, 316 So. 2d 810 (La. App., 1975); Pettis v. State Farm Mutual Automobile Ins. Co., 286 Ala. 344, 239 So. 2d 772 (1970); Tomasetti v. Maryland Casualty Co., 117 Conn. 505, 169 A. 54 (1933).

Thus, the common thread that runs through the fabric of implied permission under Nebraska law and that of other jurisdictions is a course of conduct indicating mutual acquiescence or lack of objection under circumstances signifying assent. With one minor exception, the evidence here indicated that Sharon had never been allowed to drive the automobile alone, that she was not granted permission on this particular occasion, and that she understood she was not to use the car. The exception, and the view of the evidence most favorable to the prevail-

ing party, consisted of a statement by Sharon that she had driven the car to a drugstore with permission of Janet less than once a month, always on occasions when Janet would pick her up, take her to Janet's house, and then let her drive to the drugstore and back. This is countered by contrary statements of Sharon and unequivocal statements by Janet that she had never allowed Sharon to drive the car alone. However, even assuming the truth of the one statement, isolated instances of permission for a specific purpose under recurring special circumstances do not amount to a "course of conduct indicating mutual acquiescence or lack of objection under circumstances signifying assent" to a use for a purpose "wholly unrelated in time, character, or circumstances." As a matter of fact, the evidence conclusively establishes the contrary, i.e., there was no permission, express or implied, for Sharon to use the automobile on this occasion. Therefore, we are compelled to reach the conclusion that the findings of the trial court were clearly wrong.

Accordingly, we find that at the time of the use of the Volkswagen automobile by Sharon, she did not have permission to use the same; she was not an additional insured under the omnibus clause; and the policy issued by MFA does not afford Sharon coverage for the accident in question. The judgment of the trial court is reversed and judgment is entered accordingly for the plaintiff.

REVERSED.

McCOWN, J., dissenting.

The opinion of the court acknowledges that the judgment of the trial court finding that there was permission to drive within the terms of the policy had the effect of the verdict of a jury and could not be set aside unless clearly wrong as a matter of law. The opinion then proceeds to weigh and resolve conflicts in the evidence and to determine the weight to be given to the testimony, which obviously includes

a determination of the credibility of each witness, and concludes that the trial court's determination of the facts was clearly wrong. I disagree with that conclusion. The evidence was sufficient to support the findings and judgment of the District Court.

We have consistently held that in a case such as this it is not within the province of the Supreme Court to weigh or resolve conflicts in the evidence. The credibility of witnesses and the weight to be given their testimony are for the trier of fact. Merten v. Pedersen, 199 Neb. 34, 255 N. W. 2d 869.

It has also consistently been held that in testing the sufficiency of the evidence to support a verdict, it must be considered in the light most favorable to the successful party, all conflicts must be resolved in his favor, and he is entitled to the benefit of every inference that can reasonably be deduced from the evidence. Fabricators, Inc. v. Farmers Elevator, Inc., 203 Neb. 150, 277 N. W. 2d 676.

In the present case there were only two witnesses; Janet, the owner of the automobile, and her 26-year-old sister, Sharon, the driver. Their testimony was conflicting and there were inconsistencies in the testimony of each. The owner testified that she had never given the driver permission to drive the automobile by herself. The driver testified that she had driven the car by herself, with the permission of the owner, on short trips to the drugstore about once a month over a period of some 2 to 3 years, and that approximately a month before the accident involved here the driver, with the permission of the owner, drove by herself to the doctor's office and thereafter drove into downtown Omaha to pick up the owner at her place of employment. This testimony was uncontroverted by the owner. It is also undisputed that the owner had frequently given permission to the driver to drive the automobile over the period of 2 or 3 years before the incident on occasions when either the owner or another sister were present in

the car. There was no testimony by either witness that the owner had ever refused permission to the driver to drive on any occasion except one time approximately 1 year before the incident here occurred, and there is no explanation as to the reason for that refusal. There was no discussion about driving the automobile at the time the owner delivered the keys to the driver along with her house keys. The driver testified that she assumed her sister wouldn't mind her taking the car.

It seems clear that the evidence in this case as to implied permission was conflicting and contradictory, and it is undisputed that there was no express permission. The trial court, as the fact finder, resolved the evidence in favor of the driver. This court has now held, as a matter of law, that where only express permission has been granted during the prior course of conduct of the parties, implied permission is thereafter insufficient and only express permission can constitute permission under the terms of an automobile liability policy.

In this case the trial court was the fact finder. The posture of the case in this court is the same as though the case had been submitted to a jury under complete and proper instructions as to the law, and a jury had returned the same verdict the trial court did here. The judgment of the trial court was not clearly wrong as a matter of law and should have been affirmed as a matter of fact.