STATE FARM MUTUAL INSURANCE COMPANIES, APPELLEE AND
CROSS-APPELLANT, V. AMCO INSURANCE COMPANY, APPELLANT
AND CROSS-APPELLEE, AND ROBERT J. HITZ III, APPELLEE.
621 N.W. 2d 553

Filed January 23, 2001.   No. A-99-1463.

Dean J. Sitzmann and Fred B. Campbell, Jr., of Wolfe, Snowden, Hurd, Luers & Ahl, for appellant AMCO Insurance Company.

Stephanie Frazier Stacy, of Baylor, Evnen, Curtiss, Grimit & Witt, for appellee State Farm Mutual Insurance Companies.

Robert B. Creager, of Anderson, Creager and Wittstruck, P.C., for appellee Robert J. Hitz III.

HANNON, SIEVERS, and MOORE, Judges.

SIEVERS, Judge.

While parking a 1990 Oldsmobile Cutlass automobile owned by Sue Bordovsky, Robert J. Hitz III (B.J.) collided with a Gas 'N Shop convenience store causing damage to the Cutlass, the building, an automated teller machine (ATM), and a patron inside the store. B.J. and Sue were insured by different insurance companies. In the resulting declaratory judgment action to determine coverage, both insurance companies alleged that B.J. did not have permission to drive Sue's Cutlass and that therefore neither had a duty to provide coverage. The parties stipulated that Sue's coverage, AMCO Insurance Company (AMCO), would be primary coverage and that the coverage of B.J.'s carrier, State Farm Mutual Insurance Companies (State Farm), would be excess coverage, unless the court found that B.J. did not have permission to drive Sue's Cutlass, whereupon neither insurance company would have to provide coverage. The trial court found that Sue's 16-year-old son, Kyle Bordovsky, gave B.J. implied permission to use Sue's Cutlass. Consequently, AMCO was ordered to provide primary coverage, and State Farm was ordered to provide excess coverage. AMCO appeals, and State Farm joins in the appeal. See Neb. Ct. R. of Prac. 1C (rev. 2000).

## I. FACTUAL BACKGROUND

On the night of January 17, 1998, Kyle borrowed Sue's Cutlass with her express permission. Kyle drove around with B.J., his 16-year-old friend, and two other passengers, eventually stopping at a Gas 'N Shop convenience store in Wahoo, Nebraska. Kyle parked the car in a stall at the store and left the car running while he went inside to use the restroom. While Kyle was inside the store, B.J. moved behind the wheel from the front passenger seat and drove the Cutlass around the parking lot to see if another friend's car was there. While returning the car into a parking stall, B.J. collided with the Gas 'N Shop building and crashed through a store window, causing an ATM machine inside the store to strike and injure a store patron. As a result of the collision, Gas 'N Shop claimed its store was damaged, Sue claimed her Cutlass was damaged, the bank claimed its ATM

was damaged, and the store patron claimed she suffered various personal injuries.

At the time of the accident, B.J. and Kyle, friends since the eighth grade, each had a driver's license. B.J.'s mother had a State Farm automobile insurance policy which covered B.J. While the State Farm policy provides liability insurance to insureds while operating " 'non-owned' " cars, the policy provides that a nonowned car does not include a car " 'which is not in the lawful possession of the person operating it.' " Sue had an automobile policy from AMCO which covered Kyle. The AMCO policy extended coverage to anyone using Sue's car with a " 'reasonable belief' " that he or she was entitled to use the car.

State Farm sought declaratory relief to determine its coverage for the various claims arising from B.J.'s collision. Despite wording differences in each policy's omnibus coverage clauses as detailed above, the parties stipulated that if the trial court found that B.J. drove the Cutlass without Sue's or Kyle's express or implied permission, then neither State Farm nor AMCO had a duty to provide coverage or defend B.J. The only issue before the trial court was whether B.J. had express or implied permission from Sue or Kyle to drive Sue's Cutlass at the Gas 'N Shop convenience store on January 17, 1998.

At trial, Kyle testified that since turning 16, he occasionally drove Sue's Cutlass after obtaining her permission. Sue apparently established several rules for Kyle's use of her Cutlass. "I cannot drive around fast, no horseplay. And I was not allowed to let anybody else drive the vehicle except for me," Kyle testified. Further, he testified that "every time I take [Sue's] vehicle she always says, 'Do not let anyone drive it. Don't horse around with it. Just drive it like a normal manner.' " In addition, Sue's testimony reiterated that the rule was always that Kyle was to be the only driver. Sue also testified that Kyle was not to have "too many children" in the vehicle and that he was to "drive responsibly." Kyle testified that these have been the rules since he received his license in July 1997.

Sue admitted that she expressly gave Kyle permission to take the car on the evening of the collision "to rent a movie and drive the streets for a little while and then return back home." B.J., who was at Kyle's house at the time, overheard Sue tell Kyle,

" 'Yes, you can take the car[.]' " B.J. testified that when Kyle asked Sue, " 'Can we take the car?' " she replied that "we could take the car." B.J.'s testimony was that he believed he had permission at the time of the crash to drive the Cutlass because he had driven Sue's Cutlass or Kyle's father's Nissan Maxima on other occasions and "[b]ecause it was a mutual thing that Kyle would take my car, and I would take his . . . . We just take each other's cars." B.J. conceded that he had not planned on driving the Cutlass and that he did not believe Sue was giving him permission to drive the Cutlass that night when Kyle asked to borrow the car. Although Sue understood that both Kyle and B.J. were leaving together in her car, both Sue and Kyle testified that Sue did not expressly give B.J. permission to drive the Cutlass that evening.

Kyle testified that he left the car running when he parked at the Gas 'N Shop that evening, "because I was only going to be inside for a few minutes." Neither B.J. nor Kyle said anything to each other about moving the Cutlass before Kyle left for the restroom. No permission was asked or given.

Sue did not know that B.J. had been driving her Cutlass until she went to the scene of the accident, whereupon B.J. admitted that he caused the accident and apologized for wrecking the car. Sue said she told police officers at the scene that her Cutlass had been stolen, after learning that Kyle had not caused the accident, because B.J. "had no permission to ever drive the vehicle." However, Sue admitted that she did not ensure that a criminal complaint was lodged. Officer Alan O'Sullivan, who interviewed Sue at the scene, testified that Sue did not "indicate" that the Cutlass was a stolen vehicle. Although O'Sullivan testified that he learned that "it was all right that [B.J.] drive the car" from several male and female "high school friends" at the scene, he could not remember any names of these friends.

Both Sue and Kyle testified that neither had ever given B.J. permission to drive Sue's Cutlass. Additionally, Kyle testified that he had never heard Sue give B.J. such permission. Kyle opined that had B.J. asked permission on January 17 to drive Sue's Cutlass, Kyle would not have granted permission, "[b]ecause one of the rules [sic] I was not allowed to let anyone else drive the vehicle except for me." Similarly, Sue opined that

she would not have given B.J. permission to use her Cutlass on the night of B.J.'s accident, or at any time prior to that night.

B.J. said he had operated Sue's Cutlass twice before his collision. In the fall of 1997, B.J. backed Sue's Cutlass "a short distance" out of her garage to get her lawnmower out so that he would not scratch the car with the lawnmower. B.J. testified that Sue expressly asked him to move her car and mow the yard. On another occasion, Kyle, who was mowing grass near the school parking lot, asked B.J. for a cigarette from the Cutlass, which was parked in another area of the lot. Without asking for permission, B.J. drove Sue's Cutlass approximately 100 yards in the parking lot to the area where Kyle was mowing to deliver the cigarette.

Over relevancy objections from State Farm, there was testimony about B.J.'s use of Kyle's father's Maxima. At the time of the accident, Kyle was living with his father, whose Maxima was "shared between me and my dad." Kyle's parents were divorced at the time of B.J.'s collision, had separate residences, and did not share vehicles. Kyle's father's cars were not insured under Sue's policy. Moreover, Kyle's father's rules for use of the Maxima differed from those set by Sue for use of the Cutlass. As for the Maxima, Kyle testified that he "had a little less rules than my mom's car [sic]. . . . [I]f I was driving around and someone else wanted to drive, it was okay. I could give them permission to drive my father's car." Kyle testified that after B.J. received his driver's license, he "allowed" B.J. to drive his father's Maxima "two or three times."

Kyle testified that he allowed B.J. to take his father's Maxima on several occasions in the fall of 1997. On one occasion, Kyle and B.J. were at a football game in Ashland, Nebraska, when Kyle gave B.J. permission to drive the Maxima to a gas station "to get a pop," who then allowed his girl friend to drive. According to Kyle, on another occasion, while at school, B.J. "drove [the Maxima] from the parking lot around back to the back of the shop" after Kyle had requested him to do so, so that Kyle could change the oil. Although Kyle testified that B.J. drove the Maxima another time, again driving it "around to the back of the shop," he could not recall when this took place. Kyle testified that he never told B.J. that he could take the Maxima

anywhere he wanted and that B.J. never took the Maxima without permission. Finally, B.J. testified that on another occasion, he drove a vehicle owned by one of the Bordovskys to his house, but could not remember which Bordovsky car he drove.

The evidence was that B.J. gave Kyle permission to use B.J.'s car on several occasions. Most of these occasions took place in Wahoo in the fall of 1997. On one occasion, B.J. "allowed" Kyle to take B.J.'s car home from school to retrieve football shoes. On another occasion, on their way home from football practice, B.J. and Kyle stopped to help some friends catch a calf that was running through town. B.J. ran ahead to catch the calf while Kyle, with B.J.'s permission, went back to B.J.'s car to eventually pick B.J. up. On yet another occasion, B.J. allowed Kyle to drive his car from the school parking lot to the high school's shop area, located at the "back of the school," to repair B.J.'s car. Kyle admitted that he was not sure whether this use took place prior to or after B.J.'s January 17 accident. According to B.J., Kyle also drove B.J.'s car "home to get something" on one occasion and to Burger King on another occasion without B.J.'s permission.

B.J. testified that he and Kyle drove each other's cars at school 10 to 15 times, apparently for an automobile mechanics class. B.J. said he would drive Kyle's car or Kyle would drive B.J.'s car from the parking lot to the shop located "down the street" from the school when either car "needed" to be "fixed." When the record occasionally refers to "Kyle's car," we assume this means the Maxima, as there is no evidence that Kyle owned his own car or that he ever drove the Cutlass to school, and Kyle testified about "sharing" the Maxima with his father. We also note that the record contains no evidence describing B.J.'s car, other than generic references to "B.J.'s car."

B.J. testified that Kyle gave permission to take the Maxima either by handing him the keys or by asking B.J. to move the car. B.J. also testified that the two moved each other's cars into and out of the shop during class without asking for permission on more than 10 occasions. According to B.J., from the time he received a driver's license up until the collision (4 months), nobody ever told him that he could not drive the Cutlass or the Maxima. He admitted that his parents "don't like me driving other people's cars" and told him not to drive others' cars.

From this evidence, the district court for Saunders County found that B.J. had implied permission from Kyle to drive Sue's Cutlass on January 17, 1998. According to the parties' stipulation, in which coverage depended on B.J. having Sue's or Kyle's permission to take the Cutlass, the court ordered AMCO to provide primary coverage and State Farm to provide excess coverage. State Farm joined in AMCO's appeal to this court.

## II. ASSIGNMENTS OF ERROR

AMCO and State Farm assert, summarized and restated, that the trial court erred in finding that Kyle gave B.J. implied permission to use Sue's Cutlass.

## III. STANDARD OF REVIEW

■ Determinations of factual issues in a declaratory judgment action will not be disturbed on appeal unless they are clearly wrong. *Heinold v. Siecke*, 257 Neb. 413, 598 N.W.2d 58 (1999).

## IV. ANALYSIS

■ A suit for declaratory judgment may involve questions of both law and equity. *Hemenway v. MFA Life Ins. Co.*, 211 Neb. 193, 318 N.W.2d 70 (1982). Whether an initial permittee granted permission to a third person to use an automobile is a question of fact. See, *Bekaert v. State Farm Mutual Automobile Ins. Co.*, 230 F.2d 127 (8th Cir. 1956); *MFA Ins. Companies v. Mendenhall*, 205 Neb. 430, 288 N.W.2d 270 (1980); 7 Am. Jur. 2d *Automobile Insurance* § 232 (1997). Clearly, the determinative question is one of fact: Did B.J. have express or implied permission to operate the Cutlass? An action for declaratory judgment which involves a question of fact entitles the parties to a jury trial. *Mendenhall, supra.* However, where the record shows that the case was tried without a jury, and there is no showing of protest or objection by either litigant, an appellate court will presume that a jury was waived. *Id.*

A judgment on a fact issue tried to the court alone has the effect of a jury verdict and will not be set aside unless clearly wrong. *Hemenway, supra.* In determining whether the evidence supports the findings of the trial court in an action at law where a jury has been waived, the evidence must be considered in the light most favorable to the successful party, all conflicts must be

resolved in that party's favor, and the party is entitled to the benefit of every inference that can reasonably be deduced from the evidence. *Id.*

Here, the case was tried without a jury, and there is no showing of protest or objection by either litigant. Therefore, the matter comes down to whether we can say that the trial court was clearly wrong in finding that B.J. had implied permission from Kyle to drive the Cutlass. State Farm and AMCO argue that the trial court misapplied the doctrine of implied permission and that thus, the relevant evidence is insufficient to warrant a finding of implied permission. We begin our analysis with an overview of Nebraska law governing omnibus automobile insurance coverage.

### 1. Initial Permittee and Second Permittee Rules

In Nebraska, automobile insurance policies must insure the driver named in the policy, the "named insured," as well as any other person using the automobile with the named insured's express or implied permission. Neb. Rev. Stat. § 60-534 (Reissue 1998) (the omnibus statute). The reason for this mandatory extension of coverage is so the public may be protected from damages resulting from accidents caused by the negligent driving of irresponsible and noninsured drivers operating vehicles they do not own or insure. *Protective Fire & Cas. Co. v. Cornelius*, 176 Neb. 75, 125 N.W.2d 179 (1963).

Nebraska follows the "hell or high water" rule. Under this rule, if permission to operate an automobile is initially given, then " 'despite hell or high water, such operation is considered to be within the scope of the permission granted, regardless of how grossly the terms of the original bailment may have been violated.' 7 Appleman, Insurance Law and Practice, § 4366, p. 308." *Hull v. Allstate Ins. Co.*, 187 Neb. 130, 132, 187 N.W.2d 650, 651 (1971). As long as the first use is with the permission of the owner, later deviations are immaterial. *Barnett v. Peters*, 254 Neb. 74, 574 N.W.2d 487 (1998). Permission may be express or implied. § 60-534; *Mendenhall, supra.* The initial permission rule "reflects the view that automobile liability insurance is for the benefit of the public as well as insureds. Litigation as to the scope of the permission, the purpose, time,

or place of use, and similar issues should not be permitted or encouraged." *Hull*, 187 Neb. at 132, 187 N.W.2d at 651.

█ Failing to " 'see the distinction between a case where a first permittee exceeds the scope of permission in terms of time, place, or purpose, and a case where he exceeds the scope of permission in terms of use of the vehicle by another,' " the Supreme Court extended the "hell or high water" rule beyond the relationship between the owner and initial permittee to the relationship between the initial permittee and third parties who drive the owner's car. *State Farm v. D.F. Lanoha Landscape Nursery*, 250 Neb. 901, 908, 553 N.W.2d 736, 740 (1996), quoting *Odolecki v. Hartford Accident & Indemnity Co.*, 55 N.J. 542, 264 A.2d 38 (1970). Consequently, under the omnibus clause of an automobile insurance policy, the provision required by § 60-534 to extend liability coverage to those driving the covered automobile with the insured's consent, when a named insured gives consent to the initial permittee, a third person allowed to drive the vehicle by the initial permittee likewise is covered, except in cases of theft or conversion. *D.F. Lanoha Landscape Nursery, supra.*

The parties interpreted the second permittee rule in *D.F. Lanoha Landscape Nursery* in their stipulation to mean that B.J., a third-party driver, would be insured if he had express or implied permission from Kyle, the initial permittee. The Nebraska Supreme Court has stated that it is "committed to a liberal construction of the omnibus statute to effectuate its purpose." (Syllabus of the court.) *Farm Bureau Ins. Co. v. Allied Mut. Ins. Co.*, 180 Neb. 555, 143 N.W.2d 923 (1966).

Although *D.F. Lanoha Landscape Nursery, supra*, did not explicitly hold that second permittee liability depends upon express or implied permission from the initial permittee, in discussing whether a genuine issue of material fact existed on a motion for summary judgment, the court in *D.F. Lanoha Landscape Nursery* reasoned:

> [T]he [trial] court could find that Calderon, as the initial permittee, gave either express or implied permission for [a third party] as well as the other laborers, to use the van through a course of conduct pursued with knowledge of the van's use by the laborers for a considerable time period.

250 Neb. at 909-10, 553 N.W.2d at 741.

■ Other jurisdictions with a second permittee rule condition a second permittee's omnibus insurance coverage on the receipt of express or implied permission from the initial permittee. See, *Lurtz v. Ehlers*, 608 S.W.2d 147, 149 (Mo. App. 1980) (interpreting requirement under second permittee rule that first permittee "authorize" operation of vehicle by third party as giving third party express or implied permission); *Country Mutual Ins. Co. v. Bowe*, 13 Ill. App. 3d 386, 300 N.E.2d 274 (1973) (in determining whether initial permittee had authority to grant permission to others to use automobile, if named insured does not grant express permission to second permittee, permission can be implied and named insured is deemed to have delegated his power to grant permission to first permittee). Clearly, a third party operating a named insured's vehicle becomes an additional insured party when given express or implied permission to operate the vehicle from an initial permittee.

## 2. STIPULATION

The State Farm and the AMCO insurance policies in this case each have omnibus clauses which, although worded differently, extend coverage to all drivers operating the insured vehicle with the owner's permission. Despite differences in policy language, the parties stipulated prior to trial that B.J. was not entitled to any coverage unless he had express or implied permission from Sue or Kyle. While B.J. argues that the language of each policy provides coverage for his use of the Cutlass, stipulations voluntarily entered into between the parties to a cause for the government of their conduct and the control of their rights during the trial will be respected and enforced by the courts, if such stipulations are not contrary to good morals or public policy. *Mischke v. Mischke*, 253 Neb. 439, 571 N.W.2d 248 (1997).

Here, the stipulation was voluntarily agreed to and accurately reflects the initial and second permittee rules by providing that B.J. is entitled to coverage if he had express or implied permission from Sue, the owner and named insured, or from Kyle, the initial permittee. Because the stipulation is consistent with Nebraska's interpretation of omnibus automobile insurance coverage, it is not contrary to good morals or public policy.

Moreover, the omnibus statute controls over inconsistent terms in insurance policies. *Protective Fire & Cas. Co. v.*

*Cornelius*, 176 Neb. 75, 125 N.W.2d 179 (1963). Thus, we need not decide whether the requirements of "reasonable belief" in the AMCO policy that use of an automobile is permitted, or of "lawful possession" of an automobile in the State Farm policy are the same or make a difference in the outcome. In short, we need not become entangled in the differing language of the two policies as the stipulation reflects controlling Nebraska law.

### 3. APPLICATION OF INITIAL PERMITTEE AND SECOND PERMITTEE RULES

Under the initial permission rule, B.J. is entitled to coverage if he had Sue's express or implied permission to operate the Cutlass. But, Sue's permission is not determinative because B.J. is also entitled to coverage under the second permittee rule in *State Farm v. D.F. Lanoha Landscape Nursery*, 250 Neb. 901, 553 N.W.2d 736 (1996), if, absent theft or conversion by B.J., Kyle gave B.J. express or implied permission to use the Cutlass.

Express permission " 'must be of an affirmative character, directly and distinctly stated, clear and outspoken, and not merely implied or left to inference. . . .' " *Bailey v. Insurance Co.*, 265 N.C. 675, 678, 144 S.E.2d 898, 900 (1965), quoting *Hawley v. Indemnity Ins. Co.*, 257 N.C. 381, 126 S.E.2d 161 (1962). See, also, 7 Am. Jur. 2d *Automobile Insurance* § 228 (1997). On the other hand, implied permission to use an automobile arises from a course of conduct indicating mutual acquiescence or lack of objection under circumstances signifying assent. See, *MFA Ins. Companies v. Mendenhall*, 205 Neb. 430, 288 N.W.2d 270 (1980); *State Farm Mutual Automobile Ins. Co. v. Kersey*, 171 Neb. 212, 106 N.W.2d 31 (1960). "[I]mplied permission is not confined alone to affirmative action, and is usually shown by usage and practice of the parties over a sufficient period of time prior to the day on which the insured car was being used." 7 Am. Jur. 2d, *supra* at 804-05. However, express permission granted for limited specific purposes on isolated occasions does not imply general permission to use an automobile for purposes wholly unrelated in time, character, or circumstances. *Mendenhall, supra.*

### (a) Express Permission From Sue or Kyle

Sue and Kyle both testified that Sue did not expressly give B.J. permission to drive the Cutlass, nor did B.J. believe that Sue was granting him such permission when she expressly permitted Kyle to take the Cutlass on the evening of the accident. On the date of the accident, B.J. did not ask for permission from Sue or Kyle to drive the car, nor was such expressly given by Kyle. Clearly, B.J. did not have express permission from either Sue or Kyle to drive the Cutlass, and we turn to the matter of implied permission.

### (b) Implied Permission From Sue

The evidence shows that B.J. drove Sue's Cutlass on two occasions, once in backing out of Sue's garage to gain access to a lawnmower and once in driving across a school parking lot to bring a cigarette to Kyle. On the latter occasion, Sue was not present to give permission. On the former occasion, B.J. initially said that Sue asked only that he mow the lawn, but later, B.J. said that Sue told him to "move the car to get the mower out so I didn't scratch [her Cutlass] up." There was no further evidence of any other discourse or conduct involving Sue and B.J. about the Cutlass. At best, Sue may have expressly granted B.J. limited permission to move the Cutlass for the specific purpose of moving the Cutlass on one, isolated occasion. There is no evidence that Sue was aware of the parking lot incident. Thus, even if Sue expressly permitted B.J. to back the car out of the garage, the two prior instances of use hardly establish a course of conduct signifying Sue's assent to B.J.'s use of the Cutlass. Accordingly, there was no evidence of initial permission, express or implied, from Sue to B.J.

### (c) Implied Permission From Kyle

*State Farm v. D.F. Lanoha Landscape Nursery*, 250 Neb. 901, 553 N.W.2d 736 (1996), held that once an automobile owner grants another permission to operate his or her vehicle, any limitations made by the owner as to permissible uses or users of the car are irrelevant for purposes of omnibus coverage. Thus, once the owner grants such permission, the permittee can then expressly or impliedly permit a second permittee to operate the

vehicle, even if such grant of permission to the second permittee is outside the scope of permission from the owner to the initial permittee. *Id.* See, also, *State Farm v. Zurich Am. Ins. Co.*, 62 N.J. 155, 299 A.2d 704 (1973) (lack of named insured's express or implied permission for use by second permittee is irrelevant to omnibus insurance coverage).

Here, neither party alleged or argued that Sue's Cutlass was stolen, nor was there evidence of such, making theft or conversion a nonissue in this case. On the night of the accident, Sue gave Kyle express permission to drive the Cutlass, but such permission was limited by her rules, including that no one else drive the car. Under *D.F. Lanoha Landscape Nursery, supra*, the facts that Sue granted Kyle permission with the understanding that Kyle and B.J. were going "to rent a movie and drive the streets for a little while and then return back home" and that Sue warned Kyle that no one else was to drive the Cutlass do not determine whether B.J. had implied permission to drive the Cutlass. In finding that B.J. had Kyle's implied permission, the trial court based its decision on the following:

> [T]he habitual course of use whereby Kyle, or other Bordovsky family members, gave [B.J.] permission to move the Bordovsky car for short distances. Although this course of use was only of four months duration, it had existed for the entire length of time that [B.J.] had held a driver's license.

In addition, the trial judge recognized that Kyle and B.J. had "driven the other's vehicle on various occasions, which occasions were primarily related to shop class at school," and that "nearly all of the occasions when [B.J.] drove a Bordovsky vehicle were for the limited purpose of moving a vehicle out of the way or for a short distance." These are findings of fact. Therefore, the issue becomes whether, when considering the evidence most favorably to B.J. as we must, the trial court was clearly wrong in finding a course of conduct between Kyle and B.J. indicating mutual acquiescence or lack of objection under circumstances signifying assent. See *MFA Ins. Companies v. Mendenhall*, 205 Neb. 430, 288 N.W.2d 270 (1980).

In fashioning Nebraska's rule of implied permission, the Nebraska Supreme Court stated, " 'Implied consent involves an

inference arising from a course of conduct *or relationship between the parties . . . .* " (Emphasis supplied.) *Mendenhall,* 205 Neb. at 438, 288 N.W.2d at 274, quoting *Cooper v. Firemen's Fund Ins. Co.,* 252 S.C. 629, 167 S.E.2d 745 (1969). Other courts have recognized the importance of friendship between a vehicle owner or initial permittee and the driver when determining whether the owner or initial permittee has given implied permission. See, *Hughes v. Southeastern Fidelity Ins. Co.,* 340 So. 2d 293 (La. 1976) (omnibus clause in carowner's policy covered second permittee when insured carowner and truckowner frequently exchanged vehicles without restriction on use making it foreseeable that truckowner, when using insured car, would permit third person to drive it); *State Farm v. Zurich Am. Ins. Co.,* 118 N.J. Super. 84, 286 A.2d 517 (1972), *rev'd on other grounds* 62 N.J. 155, 299 A.2d 704 (1973) (permission is more readily implied where owner and operator are relatives or close friends; implied permission may be casually given and may readily be implied when actors are friends and use involved is minor; weight must be given to relationship of parties and to probabilities which that relationship would normally generate; when friends are involved, court should lean toward finding of omnibus coverage because such finding will likely accord with unspoken truth); *Bailey v. Insurance Co.,* 265 N.C. 675, 144 S.E.2d 898 (1965) (relationship between owner and user, such as kinship, social ties, and purpose of use, all have bearing on question of implied permission); *Teague v. Tate,* 213 Tenn. 269, 375 S.W.2d 840 (1964) (where insured's 17-year-old son and his 17-year-old friend were schoolmates and fraternity brothers, and they would occasionally use insured's car for social purposes, court found that insured had impliedly given son's friend permission to use car under assumption that 17-year-old boys driving with their girl friends will swap on driving occasionally).

AMCO argues that a minivan is not a Ferrari and that permission to drive the former does not equal permission to drive the latter. Therefore, AMCO argues that whether B.J. had permission to use Kyle's father's Maxima is irrelevant to the issue of whether B.J. had permission to use Sue's Cutlass and that such evidence was wrongfully admitted.

Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *Snyder v. Contemporary Obstetrics & Gyn.*, 258 Neb. 643, 605 N.W.2d 782 (2000). For evidence to be relevant under Neb. Rev. Stat. § 27-401 (Reissue 1995), all that must be established is a rational, probative connection, however slight, between the offered evidence and a fact of consequence. *Snyder, supra.* Because the exercise of judicial discretion is implicit in determinations of relevancy and admissibility under § 27-401, the trial court's decision to admit such evidence will not be reversed absent an abuse of discretion. *Snyder, supra.*

Admittedly, the fact that B.J. had permission to use Kyle's father's vehicle is a thin reed upon which to find that B.J. had permission from Kyle's mother to use her car. The obvious reasons are that Kyle's parents are divorced, maintain separate residences, have their own cars, have different driving "rules" for Kyle, and have separate automobile insurance policies. That said, we must remember that the essence of the implied permission doctrine is the course of conduct and relationship between Kyle, Sue's initial permittee, and B.J.; rather than the relationship between B.J. and Kyle's divorced parents. See, also, *State Farm v. Zurich Am. Ins. Co.*, 118 N.J. Super. 84, 285 A.2d 517 (1972), *rev'd on other grounds* 62 N.J. 155, 299 A.2d 704 (1973) (essence of implied permission by initial permittee is that from all surrounding circumstances fact finder could reasonably conclude that use by third party was not contrary to intent or will of initial permittee). Thus, Kyle's course of conduct concerning the use of each vehicle his parents let him use, considered in the context of his relationship with B.J., is the determinative factor, rather than which car Kyle may or may not have permitted B.J. to drive on particular occasions. In short, what Kyle did with respect to either vehicle and B.J., regardless of whether it was the Cutlass or the Maxima, determines whether there was implied permission flowing from Kyle to B.J. on the night of the accident. Thus, there was no error in admitting the evidence about the Maxima.

The evidence shows that B.J. and Kyle had remained good friends since eighth grade. Both were 16 years old at the time of

the accident, and they drove each other's cars between 10 and 15 occasions since B.J. turned 16, or during the 4 months prior to B.J.'s accident. B.J. testified to having driven each other's cars without the other's express permission, Kyle's driving B.J.'s car and B.J.'s driving either Kyle's father's Maxima or Sue's Cutlass. In general, each drove the other's vehicle for short distances to relocate the car at school or for recreational purposes.

Kyle's pattern of driving B.J.'s car, sometimes without B.J.'s express consent, and of allowing B.J. to drive the Maxima by failing to object when B.J. drove the Maxima during the 4 months B.J. owned a driver's license prior to the accident, makes it more probable that Kyle impliedly permitted B.J. to drive the Cutlass on the night of the accident, when Kyle left the Cutlass running with B.J. See, also, *Zurich, supra* (where parties are relatives or friends, fact that keys to car have been entrusted to operator or left in place easily accessible to him is significant factor in determining whether there was implied permission to use car).

Neither State Farm nor AMCO cite authority holding that a course of conduct by either an initial permittee or a named insured is limited to conduct concerning the vehicle involved in the accident, nor are we aware of any. And it is clear from the authority we have cited above that courts look to the totality of the circumstances in determining whether implied permission is present. Thus, we cannot say that the trial court was clearly wrong in finding that B.J. had implied permission, based on (1) Kyle's pattern of allowing B.J. to use the Maxima and, on occasion, Sue's Cutlass, without objection; (2) Kyle's pattern of using B.J.'s car without B.J.'s express permission; and (3) Kyle's longstanding friendship with B.J.

Finally, we note that Sue's and Kyle's testimony that neither would have given B.J. permission to drive the Cutlass prior to B.J.'s accident is irrelevant, because implied permission by a named insured depends upon what actually was said and done *prior* to the accident. *Allstate Ins. Co. v. Hartford Accident & Indem. Co.*, 486 S.W.2d 38 (Mo. App. 1972) (coverage may not be created or expanded by unilateral postaccident utterances by insured); *Helmkamp v. American Family Mutual Insurance Co.*, 407 S.W.2d 559 (Mo. App. 1966) (implied permission comes from what occurred before accident, and postaccident assertions

by named insured as to what he would have done prior to accident have no probative value or relevancy).

## V. CONCLUSION

For the foregoing reasons, we find that the trial court was not clearly wrong in finding that B.J. had implied permission from Kyle to drive Sue's Cutlass on the date of B.J.'s accident. Accordingly, pursuant to the parties' stipulation, we affirm the trial court's order requiring that AMCO provide primary coverage and State Farm provide excess coverage.

AFFIRMED.